JUDGE CONNER

DOC #: _1_

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| WESTPORT INSURANCE CORP., ) | **COMPLAINT** |
| ) | |
| Plaintiff, ) | Case No. **08 CIV 6057** |
| ) | |
| v. ) | |
| ) | |
| COHEN, ESTIS & ASSOCIATES, LLP; ) | |
| RONALD J. COHEN; ANTONIA ) | |
| WARMERS CASTON; DANIEL ) | |
| STURRUP; and ALBERT STURRUP, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, Westport Insurance Corporation ("Westport"), for its Complaint against the above-named defendants, alleges as follows:

### NATURE OF THE ACTION

1.      Westport brings this action pursuant to 28 U.S.C. §§ 2201 and 2202 for a declaratory judgment regarding its rights and obligations, if any, under Lawyers Professional Liability Insurance Policy No. NRL-004872-6 (the "Policy"), issued to Cohen, Estis & Associates, LLP ("Cohen, Estis") for the policy period January 1, 2006 to January 1, 2007, with respect to the action captioned *Antonia Warmers Caston, Daniel Sturrup and Albert Sturrup v. Ronald J. Cohen and Cohen, Estis & Associates, LLP,* Index No. 2006-2979 (N.Y. Sup. Ct., Dutchess County) (the "Underlying Action").

2.      In this action, Westport seeks a judgment declaring, among other things, that coverage for the Underlying Action is precluded by application of the Policy's "prior knowledge" exclusion and by the Policy's "dishonesty exclusion."

### JURISDICTION AND VENUE

3.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between plaintiff and defendants, and the amount in

controversy exceeds the sum of $75,000, exclusive of interest and costs.  The court has personal jurisdiction over the defendants in this matter.

4.    Venue is proper pursuant to 28 U.S.C. § 1391, in that some defendants reside in New York and the events giving rise to the claim at issue in this action occurred in this district.

5.    An actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties.

## PARTIES

6.    Plaintiff Westport is an insurance company organized under the laws of Missouri with its principal place of business in Overland Park, Kansas.

7.    Defendant Cohen, Estis, upon information and belief, is a law firm organized under the laws of New York with its principal place of business in Goshen, New York.

8.    Defendant Ronald J. Cohen, upon information and belief, is a partner of Cohen, Estis and is a resident of New York.

9.    Defendant Antonia Warmers Caston is a plaintiff in the Underlying Action and, upon information and belief, is a resident of New York.

10.    Defendant Daniel Sturrup is a plaintiff in the Underlying Action and, upon information and belief, is a resident of Maine.

11.    Defendant Albert Sturrup is a plaintiff in the Underlying Action and, upon information and belief, is a resident of Maine.

## FACTUAL ALLEGATIONS

### The Policy

12.    Westport issued the Policy to Cohen, Estis for the claims-made policy period January 1, 2006 to January 1, 2007.  A true and correct copy of the declarations page, policy form and endorsements of the Policy is attached as Exhibit A.

13.    Subject to all of its terms, conditions and limitations, the Policy provides coverage for "DAMAGES as a result of CLAIMS first made against any INSURED during the POLICY PERIOD." The Policy provides an aggregate limit of liability of $1,000,000, inclusive of

2

CLAIMS EXPENSES up to $500,000.

14.    As set forth below, the Policy by its terms precludes coverage for the Underlying Action.

## The Underlying Action

15.    On June 1, 2006, Antonina Warmers Caston, Daniel Sturrup and Albert Sturrup filed a verified complaint against Ronald J. Cohen and Cohen, Estis. A true and correct copy of the Underlying Action is attached as Exhibit B.

16.    The verified complaint alleges that Donald Boehm retained Mr. Cohen and Cohen, Estis sometime in early 2004 to provide legal services in connection with the sale of real estate (the "Property") owned by the Tessie Warmers Trust No. 1 ("Trust"). (Ex. B ¶ 10)

17.    The Underlying Action asserts that Mr. Boehm was "at best" a trustee of the Trust, and that at the time Mr. Boehm retained Mr. Cohen and Cohen, Estis, Mr. Boehm was in the process of being removed as fiduciary for the Estate of Frederic J. Warmers ("Warmers Estate"). (Ex. B ¶¶ 11, 12.)

18.    The underlying plaintiffs allege that at the time Mr. Cohen and Cohen, Estis agreed to represent Mr. Boehm in connection with the Property, they were also representing Mr. Boehm in Warmers Estate proceedings to remove him and compel his account. (Ex. B ¶ 13.)

19.    The verified complaint states that Mr. Cohen and Cohen, Estis should have known that Mr. Boehm committed fraud and defalcation in connection with the Warmers Estate and unlawfully diverted hundreds of thousands of dollars to which they were never entitled. (Ex. B ¶ 14.)

20.    The Underlying Action alleges that on or about March 1, 2004, Mr. Boehm entered into a contract for sale for the Property with Panamoka Realty, LLC and Connelly Industries, Inc. (the "Contract"). (Ex. B ¶ 15.)

21.    The underlying plaintiffs aver that the Contract demonstrates that Mr. Boehm was intended to personally benefit from a Trust transaction and as alter ego of Connolly Industries, Inc. and that Mr. Cohen and Cohen, Estis did not advise the underlying plaintiffs that the

3

Contract was being contemplated nor that Trust property was considered for sale.  (Ex. B ¶ 16.)

22.    The verified complaint also alleges that Mr. Cohen and Cohen, Estis drafted the

Contract and were aware of Mr. Boehm's alleged personal interest in the Trust transaction.  (Ex.

B ¶ 17.)

23.    The Underlying Action asserts that the Contract closed on or about April 27, 2004

and that in connection with the closing Mr. Cohen and Cohen, Estis facilitated the diversion of

over $350,000 in cash proceeds from the sale of the Property to themselves, Mr. Boehm and

entities which were Boehm's alter egos.  (Ex. B ¶¶ 20, 21.)

24.    The underlying plaintiffs state that at least $68,500 was diverted to Mr. Cohen

and Cohen, Estis as legal fees in connection with the sale of the Property and that Cohen and his

firm knew or should have known that such fees were being collected for various legal matters for

Mr. Boehm that were unrelated to the Trust Property transaction.  (Ex. B ¶ 21.)

25.    The verified complaint also provides that a the time of the Trust Property

transaction, Mr. Cohen and Cohen, Estis had previously been paid legal fees by various of Mr.

Boehm's alter egos, thereby placing them on notice that the funds they were diverting went

directly to Mr. Boehm, not to any legitimate claim or obligation of the trust.  (Ex. B ¶ 23.)

26.    Westport agreed to defend Mr. Cohen and Cohen, Estis in the Underlying Action

subject to a full and complete reservation of rights, including the right to deny coverage based on

the Policy's "prior knowledge" exclusion and the Policy's "dishonesty" exclusion.

### The Related Bankruptcy Proceedings

27.    On March 31, 2004, the debtors Balco Equities Limited, Haddon Holdings, Ltd.

And Sarah Enterprises International, Ltd. (collectively the "Debtors") each filed a voluntary

petition for relief under chapter 11 of the bankruptcy code.

28.    The Debtors cases were consolidated on April 8, 2004 and subsequently

converted to chapter 7 liquidations.

29.    Also on April 8, 2004, Cohen, Estis filed an application to be retained as counsel

for the Debtors.  The affidavit of Richard J. Cohen accompanied the application, and in that

affidavit Mr. Cohen averred that no potential or actual conflict existed between Cohen, Estis, the Debtors or other interested parties.

30.     On April 9, 2004, the bankruptcy court retained Cohen, Estis to serve as counsel for the Debtors.

31.     On December 8, 2004, Mr. Cohen filed a supplemental affidavit disclosing that Cohen, Estis represented and continued to represent the Warmers Estate and also represented Mr. Boehm – a principal of the Debtors.

32.     On March 4, 2005, the bankruptcy court entered a stipulation substituting another law firm in place of Cohen, Estis as counsel for the Debtors due to Cohen, Estis's conflict of interest.

33.     On August 30, 2005, the chapter 7 trustee initiated an adversary proceeding against Cohen, Estis in connections with its failure to disclose its connections with the Warmers Estate and Mr. Boehm. That adversary proceeding sought to deny Cohen Estis any compensation and to disgorge funds previously paid to the firm.

34.     On April 10, 2006, the underlying plaintiffs filed a notice of motion to intervene in the chapter 7 trustee's adversary proceeding against Cohen, Estis.

35.     On April 26, 2006, the bankruptcy court entered an order requiring Cohen, Estis to turn over to the court approximately $42,000 in legal fees allegedly given to Cohen, Estis by the Debtor as a retainer prior to Cohen, Estis's retention as bankruptcy counsel.

36.     The bankruptcy court's July 7, 2006 memorandum decision stated that "Cohen, Estis most recently claims that it received the Retainer as part of a $68,500 fee from either Connelly Industries or the Tessie Warmers Trust on April 27, 2004 in connection with the Tessie Warmers Trust real estate transaction [i.e. the sale of the Trust Property]." A true and correct copy of the bankruptcy court's July 7, 2006 memorandum decision is attached as Exhibit C.

37.     The court further stated in that order that "Cohen Estis does not dispute the facts as outlined above ..." (Ex. C at 4.)

5

## COUNT II

### Declaratory Judgment – No Coverage
### Based on the "Dishonesty" Exclusion

47.    Westport repeats and incorporates by reference the allegations in paragraphs 1 through 46 of this Complaint.

48.    The Policy expressly does not apply to

A.    any CLAIM arising out of any dishonest, fraudulent or malicious acts, errors, omissions or deliberate misrepresentation committed by, at the direct of, or with the knowledge of any INSURED; however, the INSURED shall be reimbursed for all CLAIMS EXPENSES which would have been collectible under this policy in the event a final adjudication is made in a court of record that the INSURED did not commit such act;

(Ex. A at 4, Exclusions, A.) (the "Dishonesty Exclusion").

49.    The Underlying Action asserts that Mr. Cohen and Cohen, Estis diverted funds to themselves with knowledge that such funds were not properly the responsibility or obligation of the Trust.

50.    The underlying plaintiffs further aver that Mr. Cohen and Cohen, Estis knew that the diverted funds were actually for legal services performed for Mr. Broehm and/or his alter egos and not related to the sale of Trust Property.

51.    The bankruptcy court's July 7, 2006 memorandum decision stated that in light of Mr. Cohen's and Cohen, Estis's failure to properly disclose conflicts in connection with its retention as Debtors' counsel that "it is impossible for this Court to believe that the failures were anything but deliberate."  (Ex. C at 4.)

52.    Thus, the allegations set forth in the Underlying Action coupled with the decisions of the bankruptcy court intimate that Mr. Cohen and Cohen, Estis have acted dishonestly and made deliberate misrepresentations with respect to the acts giving rise to the Underlying Action.

53.    Accordingly, Westport is entitled to a declaration that the Policy's Dishonesty Exclusion bars coverage for the Underlying Action.

WSTPT/1049547/5722803v.1

WHEREFORE, Westport respectfully requests that the Court enter judgment in its favor as follows:

A.    On Count I, a judicial declaration that Westport has no obligation to defend or indemnify Mr. Cohen and Cohen, Estis in connection with the Underlying Action because the Prior Knowledge Exclusion bars coverage;

B.    On Count II, a judicial declaration that Westport has no obligation to defend or indemnify Mr. Cohen and Cohen, Estis in connection with the Underlying Action because the Dishonesty Exclusion bars coverage;

C.    Award Westport the CLAIMS EXPENSES it has paid to date in connection with Mr. Cohen's and Cohen, Estis's defense in the Underlying Action; and

D.    Grant such additional relief as this Court deems just, necessary and proper.


Dated: June 9, 2008
       New York, New York

                                    Respectfully submitted,

                                    Matthew J. Koster (MK 3080)

                                    Gordon & Rees LLP
                                    90 Broad Street, 23rd Floor
                                    New York, NY 10004
                                    Phone: (212) 269-5500
                                    Fax: (212) 269-5505

                                    Of Counsel:
                                    Michael P. Tone
                                    Gordon & Rees LLP
                                    1 North Franklin Street, Suite 1800
                                    Chicago, IL 60606
                                    Phone: (312) 565-1400
                                    Fax: (312) 565-6511

                                    *Attorneys for Plaintiff*

WSTPT/1049547/5722803v.1



# WESTPORT INSURANCE CORPORATION

## LAWYERS PROFESSIONAL LIABILITY INSURANCE

**Westport Insurance Corporation**
**(A Stock Insurance Company, hereinafter called the "Company")**

Policy Number    :    NRL-004872-6
Renewal of Policy :

### DECLARATIONS

> **NOTICE: THIS IS A CLAIMS-MADE POLICY.    EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THIS COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS WHICH ARE FIRST MADE AGAINST THE NAMED INSURED WHILE THE POLICY IS IN FORCE.**

A. Named Insured:       Cohen, Estis & Associates, LLP

   Mailing Address:     40 Matthews Street
                        Suite 203
                        Goshen, NY 10924

B. Policy Period:       From 12:01 A.M. January 01, 2006 To 12:01 A.M. January 01, 2007
                        Local time at the address stated herein

C. Limits of Liability:   $1,000,000              Each Claim
                          $1,000,000              Aggregate for the Policy Period

D. Deductible:          $25,000                 Each Claim

E. Premium:             $17,405

F. Retroactive Date:    06/26/1995

The Declarations and the forms listed below and attached hereto, together with the completed and signed application and supplements, shall constitute the contract between the Named Insured(s) and the Company.

Forms and endorsements made a part of this policy are listed on the attached Schedule 1A.

_____
Authorized Representative

Date: 01/17/2006

COPY
COR.OOP.0776 O (2/98)



### Schedule 1A

#### Schedule of Form(s) / Endorsement(s)

Insured: Cohen, Estis & Associates, LLP                    **Policy Number:**        NRL-004872-6
                                                           **Renewal of Policy :**

| COR.OOP.0752 (12/98) | Lawyers Professional Liability Policy Form - 50% Offset |
| COR.CPC.1924 (2/98) | Limitation of Individual Prior Acts |
| COR.CPC.1935 (2/98) | New York Disclosure Form |
| DN TER PRE(11/02) | Terrorism Disclosure Notice |

 



ENDORSEMENT

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

## LIMITATION OF INDIVIDUAL PRIOR ACTS

This policy does not apply to any CLAIM based upon, arising out of or attributable to, or directly or indirectly resulting from an act, error, omission or PERSONAL INJURY committed by the following INSURED(S) prior to the corresponding RETROACTIVE DATE:

James P. Ryan 12/26/2004
Mark Caren    02/01/2005
Timothy P. McElduff, Jr. 09/01/2003
Stuart Thalblum 07/19/2004

All other terms and conditions of this POLICY remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

**Endorsement Effective:**
January 01, 2006, 12:01 A.M. Standard Time.

**Policy Number:**
NRL-004872-6

**Endorsement No.**

**Name Insured:**
Cohen, Estis & Associates, LLP

**WESTPORT INSURANCE CORPORATION**

Countersigned.

............................................
Authorized Representative

President

Secretary

Copyright © 1998 Westport Insurance Corporation. All rights reserved.
The reproduction or utilization of this work in any form whether by any electronic, mechanical, or other means, now known or hereafter invented, including xerography, photocopying, and recording, and information storage and retrieval system is forbidden without the written permission of Westport Insurance Corporation.

COPY

COR.CPC.1924 (02/98)



# WESTPORT INSURANCE CORPORATION

## NEW YORK DISCLOSURE FORM
### PROFESSIONAL LIABILITY
### CLAIMS-MADE POLICY
### IMPORTANT NOTICE TO APPLICANT OR POLICYHOLDER

THIS DISCLOSURE FORM IS NOT THE POLICY. IT MERELY DESCRIBES SOME OF THE MAJOR FEATURES OF THE CLAIMS-MADE POLICY FORM. PLEASE READ THE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED. ONLY THE PROVISIONS OF THE POLICY DETERMINE THE SCOPE OF INSURANCE PROTECTION.

A. The policy is a claims-made policy. It applies only to a claim which is the result of an act, error, omission or personal injury arising from professional services rendered or which should have been rendered after the effective date of the policy, or retroactive date, if any, and before termination of coverage. The policy also requires that the claim must be first made against the insured during the policy period or an Extended Reporting Period; and, that written notice of the claim is provided to the Company by the insured during the policy period, any continuous renewal of this policy, or during an Extended Reporting Period.

B. The policy provides a specific type of liability insurance protecting the policyholder under certain circumstances. Please review it with an agent/attorney/consultant to see that it meets your needs and to understand thoroughly its limitations, exclusions and exceptions.

C. All coverage under the policy ceases upon the termination of the policy, except for the Automatic Extended Reporting Period coverage (required by section 73.3 (d) of this Part), unless the insured purchases additional Extended Reporting Period coverage.

D. Please review the Extended Reporting Period provisions in the policy. If there is any termination of coverage, the insured has some options:

    1) A new insurance carrier may be willing to provide full prior acts coverage, or coverage back to an agreed retroactive date.

    2) In addition to the Automatic Sixty (60) Day Extended Reporting Period, the policyholder may purchase one of the following Extended Claims Reporting Period options, to increase the amount of time within which a claim may be eligible for coverage:

        125% of the annual policy premium for 12 months.
        160% of the annual policy premium for 24 months.
        200% of the annual policy premium for 36 months.
        300% of the annual policy premium for an unlimited period.

    3) Except with an unlimited Extended Reporting Period, the expiration of any of the above reporting periods may create a gap in coverage.

E. Premium charged for a claims-made policy with a retroactive date that is the same as the inception date of the policy will be lower than premium for "Occurrence" policies. For each year the retroactive date precedes the inception date of the policy, an additional premium is charged. Once the fully mature, claims-made rate is achieved, these additional "claims-made" premium charges will no longer occur.

F. A policy, if issued with the Limit of Liability of $1,000,000 may, and a Limit of Liability above $1,000,000 will, contain certain legal defense costs offset provisions for the Limit of Liability and Deductible.

    1) Up to 50% of the Limit of Liability may be reduced by claim expenses.

    2) Only 50% of the policy deductible amount will apply to claim expenses.

IF YOU HAVE ANY QUESTIONS ABOUT THE ABOVE, PLEASE TALK TO YOUR AGENT, ATTORNEY OR OTHER CONSULTANT BEFORE PURCHASING THIS COVERAGE.





# *WESTPORT INSURANCE*
### C O R P O R A T I O N

Policy Number: NRL-004872-6

## PREMIUM DISCLOSURE NOTICE
## TERRORISM RISK INSURANCE ACT OF 2002

Named Insured:     Cohen, Estis & Associates, LLP

Effective Date:     January 01, 2006
                    12:01 A.M., Standard Time

The premium for this policy includes coverage for insured losses covered by the Terrorism Insurance Program established by the Terrorism Risk Insurance Act of 2002. The amount shown below is the premium for this coverage and does not include any charges for the portion of loss covered by the Federal Government under the Act.

The Terrorism Insurance Program established by the Terrorism Risk Insurance Act of 2002 applies to certain losses, if otherwise covered by your policy that result from an "act of terrorism," as defined in and certified under that Act. The United States Government shares in the payment of insured losses under that program and the amount of its share is 90 percent of such losses that exceed the applicable insurer deductible.

The premium for coverage for certified acts of terrorism, as defined by the Act, is: $ 0

WESTPORT INSURANCE CORPORATION

_____
Authorized Representative

Copyright © 1998 Westport Insurance Corporation. All rights reserved.
The reproduction or utilization of this work in any form whether by any electronic, mechanical, or other means, now known or hereafter invented, including xerography, photocopying, and recording, and information storage and retrieval system is forbidden without the written permission of Westport Insurance Corporation.
COPY

DN-TERROR-PREMIUM (11/02)                                                    Page 1/1



**Westport Insurance Corporation**

[CLAIMS EXPENSES INCLUDED WITHIN LIMITS OF
LIABILITY: DEFENSE COSTS 50% OFFSET]

Westport Insurance Corporation
A Missouri Corporation
Jefferson City, Missouri

Mailing Address: Westport Insurance Corporation, 525 W. Van Buren, Suite 500, Chicago, Illinois 60607

THIS IS A CLAIMS-MADE POLICY. PLEASE READ IT CAREFULLY.

# LAWYERS PROFESSIONAL LIABILITY INSURANCE

In consideration of the payment of the premium and in reliance upon the statements in the application and supplements attached hereto and made a part hereof, and subject to all of the terms of the policy, the Company agrees with the NAMED INSURED as follows:

## INSURING AGREEMENTS

### I. COVERAGE - PROFESSIONAL LIABILITY

A. The Company will pay on behalf of any INSURED those sums in excess of the deductible which any INSURED becomes legally obligated to pay as DAMAGES as a result of CLAIMS first made against any INSURED during the POLICY PERIOD, any continuous renewal of this policy, or during any Extended Reporting Period; when reported in accordance with Conditions I.A. of the policy. The CLAIM must arise by reason of an act, error, omission or PERSONAL INJURY occurring on or after the RETROACTIVE DATE, if any. Coverage shall apply to any such CLAIMS arising out of services rendered or which should have been rendered by any INSURED, and arising out of the conduct of the INSURED'S profession as a lawyer, or as a lawyer acting in the capacity of an Arbitrator, Mediator, Title Insurance Agent or Notary Public.

B. When an INSURED acts as an administrator, conservator, executor, guardian, trustee or in a similar fiduciary role, the INSURED'S acts, errors, omissions or PERSONAL INJURIES in such capacity shall be deemed for the purpose of Insuring Agreement I.A. to be the performance of professional services for others, in the INSURED'S capacity as a lawyer. This coverage shall not apply to any CLAIM against any INSURED as the beneficiary or distributee of any trust or estate.

### II. DEFENSE, INVESTIGATION AND SETTLEMENT OF CLAIMS, TRANSFER OF DUTIES

As respects such insurance as is afforded by this policy, the Company shall:

A. have the right and duty to defend, including selection of counsel and arbitrators, in any INSURED'S name and on any INSURED'S behalf any CLAIM for DAMAGES against any INSURED, even if such CLAIM is groundless, false or fraudulent; and shall have the right to make such investigation, negotiation and settlement, subject to II.B. below, of any CLAIM as it deems expedient.

B. not settle any CLAIM without the written consent of the NAMED INSURED which consent shall not be unreasonably withheld.   If, however, the NAMED INSURED refuses to consent to a settlement recommended by the Company and elects to contest the CLAIM or continue legal proceedings in connection with such CLAIM, the Company's liability for the CLAIM shall not exceed the amount for which the CLAIM could have been settled up to the date of such refusal.

In any event, the Company shall not be obligated to pay any DAMAGES on any CLAIM after the limit of the Company's liability has been exhausted by payment of DAMAGES.



C. reimburse up to $250 to each INSURED for each day or part thereof for his or her attendance at the Company's request at a trial, court-imposed hearing or arbitration proceeding involving a CLAIM, but the total amount so payable shall not exceed $5,000 per CLAIM. The deductible shall not apply to this provision, however, any payments made by the Company under this provision will be included within the applicable limit of liability and not in addition thereto.

D. **TRANSFER OF DUTIES UPON EXHAUSTION OF THE LIMIT OF LIABILITY: <u>DUTIES OF THE COMPANY</u>**

If the Company concludes that based on the number of CLAIMS which have been reported to the Company and to which this insurance may apply, the aggregate limit is likely to be used up in the payment of judgments or settlements, the Company will notify the NAMED INSURED in writing to that effect.

When the limit of liability has actually been used up in the payment of judgments or settlements the Company will:

1. notify the NAMED INSURED in writing, as soon as practicable, that:

   a. such a limit has actually been used up; and

   b. the Company's duty to defend CLAIMS subject to that limit of liability has also ended.

2. initiate and cooperate in the transfer of control to the NAMED INSURED all CLAIMS which are subject to the limit of liability and which were reported to the Company before the limit is used up.

3. agree to take such steps as are appropriate to avoid a default in, or continue the defense of, such CLAIMS until the transfer is completed, provided that the NAMED INSURED is cooperating in completing such transfer.

4. take no action whatsoever with respect to any CLAIM that would have been subject to the limit of liability, had it not been used up, if the CLAIM is reported to the Company after the limit of liability has been used up.

E. **TRANSFER OF DUTIES UPON EXHAUSTION OF THE LIMIT OF LIABILITY: <u>DUTIES OF THE NAMED INSURED</u>**

When the limit of liability has been used up, and the Company has notified the NAMED INSURED that the limit of liability has been used up, the NAMED INSURED will:

1. cooperate with the Company in the transfer of control of CLAIMS from the Company to the NAMED INSURED.

2. arrange for the defense of such transferred CLAIMS within a time period agreed to by the NAMED INSURED and the Company. Absent any such agreement, arrangements for the defense of such CLAIM must be made as soon as practicable.

3. reimburse the Company for CLAIMS EXPENSES incurred by the Company in taking those steps deemed appropriate in accordance with the provisions of D.3. above. The duty of the NAMED INSURED to reimburse the Company will begin on the date the limit of liability is exhausted; or on the date notice has been properly provided to the NAMED INSURED, in accordance with section D. above, whichever is later.

The exhaustion of any limit of liability by the payment of judgments or settlements, and the resulting end of the Company's indemnification or reimbursement obligations will not be affected by the Company's failure to comply with any condition of this provision.



VIII. **"PREDECESSOR FIRM" WHENEVER USED IN THIS POLICY SHALL MEAN** any legal entity which was engaged in the practice of law to whose financial assets and liabilities the NAMED INSURED is the majority successor in interest.

IX. **"PRIOR LAW FIRM" WHENEVER USED IN THIS POLICY SHALL MEAN** any law firm or professional corporation engaged in the private practice of law for which any lawyer listed in the application was a partner, officer, director, stockholder or employee prior to such lawyer joining the NAMED INSURED.

X. **"RETROACTIVE DATE" WHENEVER USED IN THIS POLICY SHALL MEAN** the date, if specified in the Declarations or in any endorsement attached hereto, on or after which any act, error, omission or PERSONAL INJURY must have occurred in order for CLAIMS arising therefrom to be covered under this policy. CLAIMS arising from any act, error, omission or PERSONAL INJURY occurring prior to this date are not covered by this policy.

## EXCLUSIONS

This policy does not apply to:

A. any CLAIM arising out of any dishonest, fraudulent or malicious acts, errors, omissions or deliberate misrepresentation committed by, at the direction of, or with the knowledge of any INSURED; however, the INSURED shall be reimbursed for all CLAIMS EXPENSES which would have been collectible under this policy in the event a final adjudication is made in a court of record that the INSURED did not commit such act;

B. any CLAIM arising out of any act, error, omission or PERSONAL INJURY occurring prior to the effective date of this policy if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission or PERSONAL INJURY might be expected to be the basis of a CLAIM or suit;

C. any CLAIM based upon or arising from bodily injury to, or sickness, disease, or death of any person. This exclusion does not apply to CLAIMS of mental illness, emotional distress or humiliation caused by PERSONAL INJURY;

D. any CLAIM for loss of, injury to, or destruction of tangible property; or for loss of use thereof;

E. any CLAIM arising out of any INSURED'S activities as an officer, director, partner, manager or employee of any company, corporation, operation, organization or association other than the NAMED INSURED or PRIOR LAW FIRM;

F. any CLAIM made by any INSURED under this policy against any other INSURED under this policy unless such CLAIM arises out of professional services rendered to such other INSURED as a client;

G. any CLAIM arising out of any INSURED'S capacity as a public official or an employee of a governmental body, subdivision or agency unless the INSURED is deemed to be such solely because the INSURED has rendered legal services to such governmental body and the remuneration for such legal services inures to the benefit of the NAMED INSURED;

H. any CLAIM arising out of the alleged certification or acknowledgment by any INSURED, in his or her capacity as a notary public, of a signature on a document which the INSURED did not witness being placed on the document;

I. any CLAIM arising out of defects in title which any INSURED had knowledge of at the date of issuance of such title insurance;

J. any CLAIM based upon or arising out of any intentional breach of underwriting authority by any INSURED in the INSURED'S capacity as a title insurance agent;



K.  any CLAIM arising out of conversion, misappropriation or improper commingling of client funds; or the gaining in fact of any personal profit or advantage to which the INSURED is not legally entitled;

L.  any CLAIM arising out of Nuclear Energy liability.

M.  any CLAIM arising out of any criminal acts, errors or omissions.

The Nuclear Energy Liability Exclusion (Broad Form) attaches to this policy.

## LIMITS OF LIABILITY AND DEDUCTIBLE

### I.  LIMITS OF LIABILITY

The limit of liability shall apply in excess of the deductible. CLAIMS EXPENSES are subject to a maximum of fifty percent (50%) of the applicable limit of liability. After fifty percent (50%) of the limit of liability is used for CLAIMS EXPENSES, CLAIMS EXPENSES are no longer subject to the limit of liability.

All CLAIMS EXPENSES shall first be subtracted from the limit of liability, with the remainder being the amount available to pay DAMAGES.

The liability of the Company to pay DAMAGES for each CLAIM first made against the INSURED during the POLICY PERIOD shall not exceed the amount stated in the Declarations for "Each CLAIM." Up to fifty percent (50%) of the limit of liability may be used for CLAIMS EXPENSES.

Subject to the provisions for "Each CLAIM," the liability of the Company shall not exceed the amount stated in the Declarations as "aggregate" as the result of all CLAIMS first made against the INSURED during the POLICY PERIOD.

### II.  DEDUCTIBLE

A.  The deductible stated in the Declarations applies to each CLAIM and shall be paid by the NAMED INSURED. The deductible shall be applicable to DAMAGES and CLAIMS EXPENSES.

B.  No more than fifty percent (50%) of the deductible may apply to CLAIMS EXPENSES.

C.  Payment of the deductible or portions thereof shall be made by the NAMED INSURED within thirty (30) days of receipt of demand by the Company.

### III.  CLAIMS EXPENSES

CLAIMS EXPENSES shall be included within fifty percent (50%) of the deductible, and shall reduce the limit of liability up to fifty percent (50%) of the limit of liability. After fifty percent (50%) of the available limit of liability has been reduced by CLAIM EXPENSES, CLAIM EXPENSES are payable in addition to the remaining limit of liability.

### IV.  MULTIPLE INSUREDS, CLAIMS AND CLAIMANTS

The inclusion of more than one INSURED in any CLAIM or the making of CLAIMS by more than one person or organization shall not operate to increase the limit of liability and deductible.

Two or more CLAIMS arising out of a single act, error, omission or PERSONAL INJURY or a series of related acts, errors, omissions or PERSONAL INJURIES shall be treated as a single CLAIM.





All such CLAIMS whenever made shall be considered first made on the date on which the earliest CLAIM arising out of such act, error, omission or PERSONAL INJURY was first made and all such CLAIMS are subject to the same limit of liability and deductible.

## V.  REIMBURSEMENT TO COMPANY

If the Company has paid any amounts in satisfaction of any CLAIMS in excess of the applicable limit of liability, or within the amount of the applicable deductible, the NAMED INSURED shall be liable to the Company for any and all such amounts and, upon demand, shall pay such amounts to the Company.

CONDITIONS

## I.  INSURED'S DUTIES PRECEDENT TO COVERAGE

As a Condition precedent to the availability of coverage under this policy, an INSURED'S duties in the event of a CLAIM are as follows:

A.  If a CLAIM is made against any INSURED, the INSURED must give prompt written notice to the Company, directed to:

> **Westport Insurance Corporation**
> **525 W. Van Buren, Suite 500**
> **Chicago, Illinois 60607**
> **Attention: Lawyers Professional Liability Claims Department**

Notice may also be given to any New York licensed insurance agent for Westport Insurance Corporation. Notice shall include every demand, notice, summons or other process received by any INSURED.

Failure to give notice of a claim to the Company or to the agent during the POLICY PERIOD, or the Extended Claim Reporting Period, if any, shall not invalidate any "claim" if it shall be shown not to have been reasonably possible to give such notice during such time and that such notice was given to the Company or to the agent as soon as was reasonably possible.

B.  No INSURED shall, without prior written consent of the Company, make any payment, admit liability, settle CLAIMS, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur any CLAIMS EXPENSES on behalf of the Company.

## II.  INSURED'S DUTIES SUBSEQUENT TO CLAIM

A.  All INSUREDS shall cooperate with the Company in the defense, investigation and settlement of any CLAIM. Upon the Company's request, the INSURED shall submit to examination or questioning, attend hearings, depositions and trials and assist in effecting settlements, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits.

B.  All INSUREDS shall assist the Company in effecting any rights of indemnity, contribution or apportionment available to any INSURED or the Company.

## III.  REPORTING OF POTENTIAL CLAIMS

If, during the POLICY PERIOD, an INSURED first becomes aware of a potential CLAIM (i.e., any act, error, omission or PERSONAL INJURY which might reasonably give rise to a CLAIM against any INSURED under this policy) and gives written notice of such potential CLAIM to the Company during the POLICY PERIOD, any CLAIM subsequently made against any INSURED arising out of that act, error, omission or PERSONAL INJURY shall be considered to have been made during the POLICY PERIOD.



Written notice of a potential CLAIM shall include:

A.  the specific act, error, omission or PERSONAL INJURY, including the date(s) thereof; and

B.  the injury or DAMAGE that may reasonably result; and

C.  the date and circumstances by which the INSURED became aware of the act, error, omission or PERSONAL INJURY.

## IV. EXTENDED CLAIM REPORTING PERIODS

An Extended Claim Reporting Period covers any CLAIM first reported during the Extended Reporting Period's term arising from an act, error, omission or PERSONAL INJURY which took place prior to the end of the POLICY PERIOD and on or after the RETROACTIVE DATE, if any; and, which is otherwise covered by the policy.

If, however, the INSURED has purchased other insurance covering CLAIMS first made during the Extended Reporting Period, the coverage provided by any Extended Reporting Period shall apply in excess of such insurance.

### A. AUTOMATIC SIXTY (60) DAY EXTENDED REPORTING PERIOD

In the event of any TERMINATION of coverage, there is an Automatic Sixty (60) Day Extended Claim Reporting Period commencing upon policy TERMINATION. "TERMINATION" is defined as expiration, cancellation or nonrenewal of the policy, or a decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the NAMED INSURED.

### B. NOTICE TO NAMED INSURED

Not later than thirty (30) days after the termination of coverage, the Company will mail or deliver to the NAMED INSURED written notice of the Automatic Sixty (60) Day Extended Reporting Period and the availability of, premium for, and importance of purchasing one of the additional Extended Reporting Period options offered. If the policy has been cancelled by the Company because the NAMED INSURED has failed to pay a premium when due, and if the policy has been in effect for less than one year, the Notice will be sent as above, but indicating that no additional Extended Reporting Period options are available to purchase, due to cancellation for non-payment.

### C. ADDITIONAL EXTENDED REPORTING PERIOD OPTIONS

#### 1. NAMED INSURED EXTENDED REPORTING PERIODS

If the Company or the NAMED INSURED cancels or non-renews this policy, for any reason except the non-payment of premium on a policy in effect for less than one year, the NAMED INSURED shall have the right to an endorsement providing an Extended Reporting Period in addition to the Automatic Sixty (60) Day Extended Reporting Period by payment of an additional premium within sixty (60) days from the date of TERMINATION of coverage or thirty (30) days from the date of mailing or delivery of the above required notice, whichever is greater. The additional premium for the Extended Reporting Period shall be:

> 125% of the policy's last annual premium for 12 months;
> 160% of the policy's last annual premium for 24 months;
> 200% of the policy's last annual premium for 36 months;
> 300% of the policy's last annual premium for unlimited.



2.   **INDIVIDUAL, NON-PRACTICING ATTORNEY EXTENDED REPORTING PERIOD**

If any INSURED individual retires from, or ceases, the private practice of law, such INSURED shall have the right to purchase an Individual Extended Reporting Period by payment of an additional premium within sixty (60) days from the date that INSURED ceases the private practice of law. The scope of coverage for this Individual Extended Reporting Period is accordingly limited to CLAIMS made against such INSURED. The additional premium for an Individual Extended Reporting Period shall be:

> 125% of the policy's per-lawyer annual premium for 12 months;
> 160% of the policy's per-lawyer annual premium for 24 months;
> 200% of the policy's per-lawyer annual premium for 36 months;
> 300% of the policy's per-lawyer annual premium for unlimited.

D.   **EXTENDED CLAIM REPORTING PERIOD: LIMITS OF LIABILITY**

1.   If the NAMED INSURED (under option C.1.), or the Individual, Non-practicing INSURED (under option C.2.) has been continuously insured, under policies issued by the Company, for less than three (3) years, the aggregate limit of liability for the Extended Reporting Period shall be the greater of the amount of coverage remaining in the policy's annual aggregate limit of liability or fifty percent (50%) of the last policy's annual aggregate limit of liability.

2.   If the NAMED INSURED (under option C.1.), or the Individual, Non-practicing INSURED (under option C.2.) has been continuously insured, under policies issued by the Company, for at least three (3) years, the aggregate limit of liability of the Extended Reporting Period shall be one hundred percent (100%) of the policy's last annual aggregate limit.

E.   **ADDITIONAL PROVISIONS OF THE EXTENDED REPORTING PERIOD**

1.   During a claims-made relationship and any Extended Reporting Period, a person employed or otherwise affiliated with the NAMED INSURED and covered by the NAMED INSURED'S claims-made policy during such affiliation shall continue to be covered under such policy and any Extended Reporting Period after such affiliation has ceased, for such person's covered acts or omissions during such affiliation.

2.   If this policy has been issued to a corporation or partnership, the Company shall provide the option to purchase Extended Reporting Period coverage upon TERMINATION of coverage to any INSURED covered under the policy if:

   a.   the corporation or partnership has been placed in liquidation or bankruptcy or permanently ceases operations; and

   b.   the corporation or partnership, or its legally designated representative does not purchase Extended Reporting Period coverage; and

   c.   the INSURED sends a written request and payment for the Extended Reporting Period coverage within one hundred twenty (120) days of TERMINATION of coverage.

The Company shall have no obligation to provide notice regarding the availability of the Extended Reporting Period coverage to anyone other than the NAMED INSURED.

V.   **SUBROGATION**

In the event of payment by the Company under this policy, the Company shall be subrogated to all INSUREDS' rights of recovery against any person or organization. All INSUREDS shall cooperate with the Company and do whatever is necessary to secure such rights and shall do nothing to prejudice such rights.

 

## VI. CHANGES

The terms of this policy shall not be waived or changed except by endorsement issued to form a part of this policy.

## VII. ASSIGNMENT

Assignment of interest under this policy shall not bind the Company unless its consent is endorsed hereon. If, however, an INSURED shall die or be adjudged incompetent, this policy shall cover the INSURED'S legal representative as the INSURED with respect to liability previously incurred and covered by this policy.

## VIII. CANCELLATION AND NONRENEWAL

### A. CANCELLATION BY THE NAMED INSURED

This policy may be cancelled by the NAMED INSURED by surrender thereof to the Company; or by mailing to the Company written notice stating when thereafter such cancellation shall be effective. If this policy is cancelled by the NAMED INSURED, the Company shall retain the customary short rate proportion of the premium.

### B. CANCELLATION BY THE COMPANY OF POLICIES IN EFFECT SIXTY (60) DAYS OR LESS

If this policy has been in effect for sixty (60) days or less, and it is not the renewal or continuation of a policy issued by the Company, the Company may cancel this policy by mailing or delivering to the NAMED INSURED written notice of cancellation at least;

1. thirty (30) days before the effective date of cancellation if cancellation is for any reason not included in paragraph B.2. below.

2. fifteen (15) days before the effective date of cancellation if cancellation is for any of the following reasons:

   a. Nonpayment of premium;

   b. Conviction of a crime arising out of acts increasing the hazard insured against;

   c. Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a CLAIM;

   d. After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current POLICY PERIOD;

   e. Material change in the nature or extent of the risk, occurring after the issuance or last annual renewal anniversary date of the policy that causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed.

   f. Required pursuant to a determination by the Superintendent that continuation of the Company's present premium volume would jeopardize the Company's solvency or be hazardous to the interest of the Company's policyholders, creditors or the public; or

   g. A determination by the Superintendent that the continuation of the policy would violate, or would place the Company in violation of any provision of the Insurance Code.

 

**C. CANCELLATION BY THE COMPANY OF POLICIES IN EFFECT FOR MORE THAN SIXTY (60) DAYS**

If this policy has been in effect for more than sixty (60) days or if this policy is a renewal or continuation of a policy issued by the Company, the Company may cancel this policy <u>only</u> for one of the reasons listed in paragraph B.2. above; and only after providing written notice to the NAMED INSURED at least fifteen (15) days before the effective date of cancellation.

The Company will mail or deliver notice, including the reason for cancellation, to the NAMED INSURED at the address shown in the policy and to the authorized agent or broker.

**D. NONRENEWAL**

If the Company decides not to renew this policy, the Company will send notice as provided in paragraph F. below, along with the reason for nonrenewal.

**E. CONDITIONAL RENEWAL**

If the Company renews this policy subject to a:

1. Change of limits;

2. Change in type of coverage;

3. Reduction in coverage;

4. Increased deductible;

5. Addition of exclusion; or

6. Increased premiums in excess of ten percent (10%), exclusive of any premium increase due to and commensurate with, insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

The Company will send notice as provided in paragraph F. below:

**F. NOTICE OF NONRENEWAL AND CONDITIONAL RENEWAL**

1. If the Company decides not to renew this policy or to conditionally renew this policy as provided in paragraphs D. and E. above, the Company will mail or deliver written notice to the NAMED INSURED shown in the Declarations at least sixty (60) but no more than one hundred twenty (120) days before:

   a. The expiration date; or

   b. The anniversary date if this is a continuous policy.

2. Notice will be mailed or delivered to the NAMED INSURED at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

3. The Company will not send notice of nonrenewal or conditional renewal if the NAMED INSURED'S authorized agent or broker mails or delivers notice that the policy has been replaced or is no longer desired.



**G. LATE NOTICE / INCOMPLETE NOTICE**

If the Company sends the NAMED INSURED an incomplete or late conditional renewal notice or a late nonrenewal notice as provided for in paragraph F. above, coverage will remain in effect at the same terms and conditions of this policy until sixty (60) days after such notice is mailed or delivered, unless the NAMED INSURED elects to cancel sooner.

**IX. OTHER INSURANCE**

Except for those CLAIMS specifically excluded pursuant to Exclusion C., the following shall apply:

If there is other insurance applicable to a CLAIM covered by this policy, this policy shall be deemed excess insurance over and above the applicable limits of liability of all such other insurance unless such other insurance is written only as specific excess insurance over the limit of liability provided in this policy.

**X. ACTION AGAINST THE COMPANY**

No action shall lie against the Company unless, as a condition precedent thereto, the INSUREDS shall have fully complied with all the terms of this policy, nor until the amount of the INSURED'S obligation to pay shall have been finally determined either by judgment against an INSURED after actual adjudication or by written settlement agreement of the INSURED, the claimant and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.

Nothing contained in this policy shall give any person or organization any right to join the Company as a co-defendant in any action against any INSURED to determine any INSURED'S liability. Bankruptcy or insolvency of an INSURED or of an INSURED'S estate shall not relieve the Company of any of its obligations hereunder.

**XI. ENTIRE AGREEMENT**

By acceptance of this policy, all INSUREDS reaffirm as of the effective date of this policy that (a) the statements in the application including all information communicated by any INSURED to the Company, attached hereto and made a part hereof are all INSUREDS' agreements and representations, (b) this policy is issued in reliance upon the truth and accuracy of such representations and (c) this policy embodies all agreements between all INSUREDS and the Company or any of its agents relating to this insurance.

**This policy is not valid unless completed by the attachment of Declarations signed by an authorized representative.**

### NUCLEAR ENERGY LIABILITY EXCLUSION (Broad Form)

It is agreed that:

I.   The policy does not apply:

A.   Under any Liability Coverage, to bodily injury or property damage

(1)   with respect to which an INSURED under the policy is also an INSURED under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an INSURED under any such policy but for its TERMINATION upon exhaustion of its limit of liability; or



(2) resulting from the hazardous properties of nuclear material with and respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the INSURED is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.  Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

C.  Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

(1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an INSURED or (b) has been discharged or dispersed therefrom;

(2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an INSURED; or

(3) the bodily injury or property damage arises out of the furnishing by an INSURED of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

II.  As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (a) containing by-product material other than the tailings or waste produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (b) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

"nuclear facility" means

(a)  any nuclear reactor,

(b)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)  any equipment or device used in the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the INSURED at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

COR.OOP.0752 (0202)                                                                                    Page 12 of 13

 

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

**WESTPORT INSURANCE CORPORATION**

President

Secretary

06/07/2006 12:57 FAX 9739944882        RATNER ASSOCIATES        → WESTPORT CLAIMS   ✉005
Jun 07 08 10:14a     Total Insurance Brokerage   (203) 325-3613        p

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF DUTCHESS
---------------------------------------------------
ANTONINA WARMERS CASTON, DANIEL
STURRUP and ALBERT STURRUP,

              Plaintiffs,               VERIFIED COMPLAINT

   -against-                        Index No.

RONALD J. COHEN and COHEN, ESTIS &
ASSOCIATES, L.L.P.,

              Defendants.
---------------------------------------------------

        Plaintiffs, Antonina Warmers Caston, Daniel Sturrup and Albert Sturrup, through

their attorneys, Corbally, Gartland and Rappleyea, LLP, for their complaint against the defendants.

state and allege:

The Parties

       1.    Plaintiff Antonina Warmers Caston is and was at all times hereinafter alleged

a resident of the County of Dutchess, State of New York.

       2.    Plaintiff Daniel Sturrup is and was at all times hereinafter alleged a resident

of the State of Maine.

       3.    Plaintiff Albert Sturrup is and was at all times hereinafter alleged a resident

of the State of Maine.

       4.    Each of the Plaintiffs is a beneficiary of the Tessie Warmers Trust No. 1 (the

"Trust").

       5.    The Trust was established by a family relation of the Plaintiffs', on or about

1

RATNER ASSOCIATES
JUN 0 7 2006

4

May 1, 1961.

6.      Upon information and belief, defendant Ronald J. Cohen is a resident of the County of Orange, State of New York.

7.      Upon information and belief, defendant Cohen, Estis & Associates, L.L.P. is a domestic limited liability partnership, with an office for the transaction of business in the County of Orange, State of New York.

8.      Upon information and belief, defendant Cohen is licensed to practice law in the State of New York, and practices law in the Counties of Orange, Dutchess and elsewhere.

9.      Upon information and belief, defendants are engaged in the practice of law in the State of New York, and practice law in the Counties of Orange, Dutchess and elsewhere.

### The Facts Giving Rise to the Claims

10.     Upon information and belief, sometime in early, 2004, defendants were retained by Donald Boehm, purported Trustee of the Trust, for legal services in connection with the sale of Trust real estate located in the County of Nassau, State of New York (the "Property").

11.     Donald Boehm ("Boehm") is not, was not and has never been beneficially interested in the Trust. At most, Boehm was a Trustee, entitled to statutory commissions if and when approved by a Court of competent jurisdiction and after due notice was afforded all Plaintiffs.

12.     At or about the time Boehm retained defendants, Boehm was in the process of being removed as fiduciary for the Estate of Frederic J. Warmers (the "Warmers Estate").

13.     Defendants, at the same time they agreed to represent Boehm in connection with the Property, were also representing Boehm in Warmers Estate proceedings, including proceedings to remove him and compel his account.

2

RATNER ASSOCIATES
JUN 07 2006

5

14.    Defendants knew or should have known that Boehm committed fraud and defalcation in connection with the Warmers' Estate, and unlawfully diverted hundreds of thousands of dollars to which he was never entitled.

15.    On or about March 1, 2004, Boehm entered a contract for sale for the Property with Panamoka Realty, LLC, and Connelly Industries, Inc., an alleged third-party vendor (the "Contract"). A copy of the Contract is annexed hereto as Exhibit 1.

16.    Among other terms, the Contract demonstrated that Boehm, individually, was intended to personally benefit from a Trust transaction, personally, and as alter ego of Connelly Industries, Inc. Defendants did not advise plaintiffs that any contract was being contemplated, or that Trust property was considered for sale.

17.    Upon information and belief, the Contract was drafted and negotiated by the defendants, on Boehm's behalf, and defendants were aware of the Boehm's alleged personal interests in the Trust transaction.

18.    Upon information and belief, the closing of title to the Property under the Contract occurred on or about April 27, 2004.

19.    Upon information and belief, at the time of the subject transaction, defendant Ronald J. Cohen was allegedly of poor health, yet defendant Cohen, Estis & Associates, L.L.P. permitted him the handle the matter, without regard to Plaintiff's interests in the Trust or Trust Property.

20.    Upon information and belief, prior to, at and after the closing, defendants facilitated, assisted in, aided, abetted and participated in the diversion of what is believed to be over $350,000.00 in cash proceeds from the sale of the Trust Property to themselves, Boehm and entities

3

CORBALLY, GARTLAND AND RAPPLEYEA, LLP  •  ATTORNEYS AND COUNSELORS AT LAW
35 MARKET STREET  •  POUGHKEEPSIE, NEW YORK 12601  •  (845) 454-1110

RATNER ASSOCIATES
JUN 0 7 2006

which were Boehm alter egos.

21.    Upon information and belief, defendants diverted at least $68,500.00 from the sale of the Property to themselves in alleged legal fees, when, upon information and belief, they knew or should have known that such fees were being collected for various legal matters for Boehm, including his various personal matters, not merely the Trust Property transaction. Based on the scope of the transaction, and defendants' own engagement letters, the fees for this transaction could not possibly have amounted to $68,500.00.

22.    None of the funds diverted by defendants were paid pursuant to Court order and no Plaintiff was on notice of any such payments until well after they were made.

23.    At the time of the preceding transaction, defendants had previously been paid legal fees by various Boehm alter egos, thereby placing them on notice that the funds they were diverting went directly to Boehm, not to any legitimate claim or obligation of the Trust.

### The Claims

### First Cause of Action

24.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "23" above, as if the same had been more fully set forth herein at length.

25.    Defendants owed Plaintiffs a fiduciary duty, including the duties of loyalty and honesty, in connection with the sale of the Trust's Property and the protection of the proceeds of sale.

26.    Defendants breached their fiduciary duty to Plaintiffs by failing to protect and safeguard Plaintiffs' interests in the Property transaction and the proceeds thereof, diverting the cash proceeds, failing to notify Plaintiffs in any medium of what was occurring, weaving and permitting

4

RATNER ASSOCIATES
JUN 0 7 2006

7

06/07/2006 12:58 FAX 9739944882    RATNER ASSOCIATES    → WESTPORT CLAIMS    ☒009
Jun 07 06 10:15a    Total Insurance Brokerage    (203) 325-3613

Boehm's personal interests throughout the transaction, taking fees to which they were not entitled, and otherwise completely failing to protect the Trust's beneficial interests. In short, defendants subordinated Plaintiffs' beneficial interests to the personal and nefarious interests of Boehm and themselves.

27.    By reason of the preceding facts, Plaintiffs are entitled to a judgment of at least $350,000.00 against defendants, together with interest.

<u>Second Cause of Action</u>

28.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "27" above, as if the same had been more fully set forth herein at length.

29.    In agreeing to represent Boehm in the Trust transaction, defendants owed Plaintiffs a duty of care, honesty and fitness, such that Plaintiffs' interests in the Trust assets would not be compromised or jeopardized by the acts or omission of defendants.

30.    In aiding and abetting Boehm's fraud upon the Plaintiffs, defendants acted in furtherance of their own self-interests, and acted negligently, recklessly and in complete disregard of the Plaintiffs' interests in the Trust.

31.    Upon information and belief, so long as defendants' fees were paid by Boehm, defendants continued to represent him, without regard to the other legal and equitable interests at stake or potentially at stake.

32.    Moreover, once defendants became aware of Boehm's intent to divert the sale proceeds, they were obligated to withdraw from representing him and notify Plaintiffs or the Court of what had been occurring, as defendants owed a fiduciary duty to Plaintiffs.

5

RATNER ASSOCIATES
JUN 07 2006

06/07/2006 12:58 FAX 9739944882        RATNER ASSOCIATES        → WESTPORT CLAIMS    ☑010
Jun 07 06 10:15a    Total Insurance Brokerage    (203) 325-3613    p

33.    By reason of the preceding facts, Plaintiffs are entitled to a judgment of at least $350,000.00 against defendants, together with interest.

### Third Cause of Action

34.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "33" above, as if the same had been more fully set forth herein at length.

35.    Defendants, in representing Boehm and continuing this representation when it was evident that he would abuse the Trust and its assets, disregarded what should have been several apparent conflicts between Boehm and the interests of Plaintiffs in the Trust Property, and in the proceeds of any sale, and disregarded and violated their duties to Plaintiffs.

36.    By reason of the preceding facts, Plaintiffs are entitled to a judgment of at least $350,000.00 against defendants, together with interest.

### Fourth Cause of Action

37.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "36" above, as if the same had been more fully set forth herein at length.

38.    Defendants' aforesaid conduct was so wanton, reckless, outrageous and deliberately violative of their duties to Plaintiffs, that an award of punitive damages would be appropriate under the circumstances of this case.

39.    By reason of the preceding, Plaintiff are entitled to a judgment of $5,000,000.00, together with interest.

WHEREFORE, Plaintiffs demand judgment as follows:

1.    On the first cause of action, a money judgment of at least $350,000.00, together with interest;

6

CORBALLY, GARTLAND AND RAPPLEYEA, LLP  •  ATTORNEYS AND COUNSELORS AT LAW
35 MARKET STREET  •  POUGHKEEPSIE, NEW YORK 12601  •  (845) 454-1110

RATNER ASSOCIATES
JUN 07 2006

9

2.    On the second cause of action, a money judgment of at least $350,000.00, together with interest;

3.    On the third cause of action, a money judgment of at least $350,000.00 together with interest;

4.    On the fourth cause of action, a money judgment of $5,000,000.00, together with interest; and

5.    That the Court grant Plaintiffs judgment for their costs and disbursements in this action, together with such other and further relief as the Court deems proper.

Dated:    May 3 1, 2006
    Poughkeepsie, New York

Yours, etc.

Allan B. Rappleyea
**CORBALLY, GARTLAND and RAPPLEYEA, LLP**
Attorneys for Plaintiffs
35 Market Street
Poughkeepsie, New York 12601
(845) 454-1110

7

RATNER ASSOCIATES
JUN 0 7 2006

06/07/2006 12:58 FAX 9739944882    RATNER ASSOCIATES    → WESTPORT CLAIMS  ☑012

Jun 07 06 10:16a    Total Insurance Brokerage  (203) 325-3613

STATE OF NEW YORK    )
                    ) ss.:

COUNTY OF DUTCHESS  )

    Antonina Warmers Caston, being duly sworn says:

    I am a plaintiff in the action herein; I have read the annexed complaint and know the contents thereof and the allegations therein are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

                                  _____
                                  Antonina Warmers Caston

Sworn to before me this
28th day of ~~April~~ 2006
    March

_____
    Notary Public

    PRISCILLA M. BALICKI
  Notary Public, State of New York
    Qualified in Orange County
My Commission Expires 7-10-08

7

RATNER ASSOCIATES
JUN 0 7 2006

06/07/2006 12:59 FAX 9739944882      RATNER ASSOCIATES       → WESTPORT CLAIMS   ☑014
Jun 07 06 10:16a     Total Insurance Brokerage  (203) 325-3613                  (

State of Maine
COUNTY OF Waldo )

Albert Sturrup, being duly sworn says:

I am a plaintiff in the action herein; I have read the annexed complaint and know the contents thereof and the allegations therein are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

Albert Sturrup

Sworn to before me this
3rd day of May, 2006

Notary Public

MICHELINA STODDARD
Notary Public, Maine
My Commission Expires February 12, 2012

RATNER ASSOCIATES
JUN 0 7 2006

8

13

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**FOR PUBLICATION**

------------------------------------------------------x

In re:                       :

                        :

BALCO EQUITIES LTD, INC.,    :
HADDON HOLDINGS LTD.,       :
SARAH ENTERPRISES           :
INTERNATIONAL LTD.,          :

                        :

                Debtors.    :

Chapter 11

Case No. 04-35777 (CGM)
(Jointly Administered)

------------------------------------------------------x

                        :

PAUL BANNER, Trustee,        :

                        :

           Plaintiff,      :

                        :

       -against-          :

                        :

COHEN, ESTIS AND ASSOCIATES, LLP,  :

                        :

           Defendant.    :

                        :

Adv. Proc. No. 05-9045

------------------------------------------------------x

**MEMORANDUM DECISION (1) DENYING ALL FEES TO
COHEN, ESTIS AND ASSOCIATES, LLP, (2) DISGORGING RETAINER
SUBJECT TO FURTHER DETERMINATION BY THE COURT,
AND (3) SUSTAINING RULING ON MOTION FOR RECONSIDERATION**

<u>A P P E A R A N C E S</u>

Mark D. Glastetter, Esq.
DEILY, MOONEY & GLASTETTER, LLP
8 Thurlow Terrace
Albany, New York
*For Paul L. Banner, Trustee*

Richard L. Weisz, Esq.
HODGSON RUSS LLP
677 Broadway, Suite 301
Albany, New York
*For Cohen, Estis and Associates, LLP*

Eric J. Small, Esq.
OFFICE OF THE UNITED STATES TRUSTEE
74 Chapel Street
Albany, New York

Anthony C. Carlini, Jr., Esq.
CORBALLY, GARTLAND AND RAPPLEYEA, LLP
35 Market Street
Poughkeepsie, New York
*For Antonina Warmers Caston, Daniel Sturrup and Burt Sturrup,
as beneficiaries of the Tessie Warmers Trust No. 1*

Michael L. Carey, Esq.
JACOBOWITZ & GUBITS, LLP
158 Orange Avenue
Walden, New York
*For Epic Orange, LLC*


**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

On April 11, 2006 this Court issued an oral ruling, later reflected in an order dated April

26, 2006 (ECF Docket No. 329), denying all professional compensation requested by Cohen,

Estis and Associates, LLP ("Cohen Estis") on its first and final fee application for attorneys' fees

of $113,707, but allowing the reimbursement of $2,517 in expenses.[1] The April 26, 2006 order

also directed Cohen Estis to disgorge $42,483, the balance of the retainer received by Cohen

Estis after deduction of the allowed expenses (the "Retainer"), to be held by the Chapter 7

Trustee pending further order of the Court.

As discussed below, at the time of the bankruptcy filing, and even after the filing, the

Cohen Estis firm had a series of actual conflicts of interest and connections with parties in

interest, and Cohen Estis concedes that it was not a "disinterested person" as that term is used in

11 U.S.C. § 101(14). In summary, Cohen Estis failed to disclose that it represented (1) the

---

[1]     The Court sustained the Chapter 7 Trustee's objection to the expense of $3,294.37 for six hours
of computer-assisted research, and payment of $2,000 to Lewis D. Wrobel as substitution counsel to the
Debtor.

principal and largest unsecured creditor, and (2) another major creditor, of which the largest

unsecured creditor was the former executor. Both of the creditors are adverse to each other and

to the bankruptcy estate.

Although Cohen Estis – and particularly its principal Ronald J. Cohen – was aware of the

conflicts of interest and relationships with major parties in interest at the time of this Chapter 11

filing, those connections were not disclosed until much later. For example, none of the following

disclosures were made prior to Cohen Estis's retention as counsel to the Debtors:

- Cohen Estis previously represented the Debtors' principal, Donald Boehm individually in numerous matters, including litigation in Supreme Court, King's County (discussed below); and defended Boehm and his wife in proceedings to foreclose on their personal residence, which also served as collateral for the Debtors' largest secured creditor, Hudson United Bank ("Hudson" or "HUB"). These connections were not disclosed for nearly eight months, notwithstanding the fact that Boehm signed two of the petitions as president and appeared and testified before this Court on behalf of the Debtors on numerous occasions. Boehm was at one pointed listed as a creditor in the Debtors' schedules and later filed unsecured claims in excess of $4 million.

- Cohen Estis represented the Estate of Frederic J. Warmers (the "Frederic Warmers Estate") from March 2003 until at least November 2003 when Donald Boehm was removed as executor of the Frederic Warmers Estate, for cause, by order of the Surrogate of Orange County. The Frederic Warmers Estate was listed as a creditor in the Debtors' schedules and filed secured claims for $1,420,000 and $1,266,079.50 in the Balco estate. In connection with its secured claims, the Frederic Warmers Estate is currently asserting a constructive trust over the only significant asset remaining in the Debtors' bankruptcy cases based on the claim that Boehm improperly allowed the property to be transferred to Balco for nominal consideration while he was the executor of the Frederic Warmers Estate.

- Cohen Estis continued to provide services to the Frederic Warmers Estate after November 2003. On March 8, 2004, less than one month prior to this bankruptcy filing, Cohen Estis filed an accounting in the Surrogate's Court on behalf of the Frederic Warmers Estate listing as estate assets certain secured long-term notes from Haddon Holdings Ltd. ("Haddon"), one of the Debtors in this case. Cohen Estis sought reimbursement of fees and expenses approximating $28,000 from the Surrogate's Court after filing this Chapter 11 case, but did not disclose the relationship to this Court until months later.

- Cohen Estis defended Boehm and two non-debtor entities owned by Boehm, LMAD, Inc. ("LMAD") and Connelly Industries, Inc. ("Connelly Industries"),

in state court litigation in Supreme Court, Kings County. In a decision rendered in that case in August 2003 the Supreme Court Justice held Boehm in contempt of court for transferring $96,000 from the Plaintiff to Connelly Industries and, thereafter, to Haddon.

- Cohen Estis served as counsel to the Tessie Warmers Trust in connection with a real estate transaction that closed in April 2004. Donald Boehm was the trustee of the Tessie Warmers Trust. Connelly Industries received a portion of the proceeds of the real estate sale.

- Cohen Estis most recently claims that it received the Retainer as part of a $68,500 fee from either Connelly Industries or the Tessie Warmers Trust on April 27, 2004 in connection with the Tessie Warmers Trust real estate transaction.

- Cohen Estis previously reported receipt of the Retainer from Donald Boehm.

Given the foregoing, and other circumstances set forth below, the Court is compelled to deny all

compensation to Cohen Estis. Cohen Estis does not dispute the facts as outlined above, and it is

impossible for this Court to believe that the failures were anything other than deliberate.

Nonetheless, Cohen Estis argues that it should be awarded compensation because "we only tried

to generate a dividend for unsecured creditors and therefore acted consistently with our fiduciary

duty to the Debtor, the estate and its creditors." Supplemental Statement of Ronald J. Cohen, ¶9.

True or not, such an intention cannot excuse the requirements mandated by the Bankruptcy Code

and Federal Rules of Bankruptcy Procedure to disclose potential and actual conflicts and

connections, as well as the source and amount of compensation; to rule otherwise would render

all professional disclosure obligations meaningless.

This decision discusses Cohen Estis' acts and omissions in the context of the troubled

bankruptcy history of these Debtors, the collateral litigation that the Debtors' bankruptcy filing

spawned, and Cohen Estis's connection with the pre-petition activity between these Debtors,

their principal Donald Boehm (also a Debtor in a case before this Court under Chapter 7 Case

No. 05-35105 and the defendant in *Hudson United Bank v. Boehm*, Adv. Proc. No. 05-9016 and

*Estate of Fredric J. Warmers et al. v. Boehm*, Adv. Proc. No. 05-9026); Boehm's non-debtor

- 4 -

entity Connelly Industries (*see Banner v. Connelly Industries*, Adv. Proc. No. 06-9036); as well as other parties in interest that are adverse to the Debtors, including the Frederic Warmers Estate, and Epic Orange, LLC ("Epic Orange").  In the second part of this decision the Court sets forth the reasons for denying compensation to Cohen Estis and ordering disgorgement of the Retainer prior to allowing Cohen Estis to present evidence.  As explained below, before determining to whom the Retainer should be disgorged, the Court will schedule a hearing to consider evidence from all interested parties, including Cohen Estis.


## JURISDICTION

This Court has subject matter jurisdiction over this adversary proceeding and fee application pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984.  Matters concerning the administration of the estate and orders to turn over property of the estate are "core proceedings" under 28 U.S.C. § 157(b)(2)(A) and (E), respectively.


## BACKGROUND FACTS

Except where otherwise noted, the following facts are undisputed.

I.    **Debtor's Chapter 11 Cases**

    A.    **Petitions and Schedules**

Cohen Estis filed petitions for the Debtors on March 31, 2004, each under Chapter 11 of the Bankruptcy Code.  The initial petition for Balco Equities Limited, Inc. (Case No. 04-35777; hereafter, "Balco") was signed by "Nancy Clark" as President of Balco, and by Andrew S. Wulfman, an associate with Cohen Estis.  The corporate resolution, identifying Balco as a

Delaware corporation, was signed by "Nancy M Cook," as President of Balco (ECF Docket No. 2). Haddon's petition (Case No. 04-35778) was signed by Donald P. Boehm as "President", and by Mr. Wulfman as counsel. According to Haddon's corporate resolution (ECF Docket[2] No. 2), which Mr. Boehm signed as the "Director," Haddon is a "Cayman Corporation," apparently referring to the Cayman Islands. The petition for the third Debtor, Sarah Enterprises, International (Case No. 04-35779; hereafter, "<u>Sarah</u>"), was also signed by Mr. Boehm as "President" and by Mr. Wulfman as counsel. Mr. Boehm signed Sarah's corporate resolution (ECF Docket No. 2) as the "Director" and identified Sarah as a "BVI Corporation," apparently referring to the British Virgin Islands. Each of the three Debtors listed their address as 120 Quassaick Avenue, New Windsor, New York.

The list of equity security holders filed April 16, 2004 (ECF Docket No. 40) identified the Nancy Cook Family Trust as the owner of all of the outstanding shares of Balco. In her "Affidavit Pursuant to Local Bankruptcy Rule 1007-2" (ECF Docket No. 12) filed in each of the Debtors' cases, Nancy Cook stated the following:

- Balco is the sole shareholder of Haddon, and Haddon is the sole shareholder of Sarah.

- Balco "is the owner of real estate located in New Windsor, New York, having a value of approximately $1.1 to $1.8 million" (the "<u>New Windsor Property</u>").

- Haddon is the owner of "a certain ocean going vessel, being the 'Motor Yacht (M/Y) Dauntless'" (hereafter, "<u>*Dauntless*</u>").

- The *Dauntless*: "was purchased as a commercial survey vessel and completely gutted and reoutfitted to a luxury yacht, taking two years to complete. The 'Dauntless' is completely fitted for sail on the high seas. The vessel has been appraised for $4.2 Million and is presently listed for sale on the world market for $3.6 Million (U.S. Currency) and is suitable for charter service on a contract basis at $35,000 per week."

- Sarah is the owner of "a certain ocean going Commercial Tug, being the 'Robust'" (hereafter, "<u>*Robust*</u>").

---

[2]   Except where otherwise indicated, all references to the "ECF Docket" are to the docket in the lead case, No. 04-35777.

— The *Robust* is described as: "a 178 foot commercial tug boat built for the British Royal Navy in 1974 with a Gross Weight of 1037 tons. She accommodates a crew of 27 andwith [sic] a cruising range of 12,000 miles is conducive to long ocean towing. According to a survey performed in August of 2001, she is valued at between $1.3 and $1.6 Million with an estimated $28 Million[3] to rebuild. The 'Robust' has been listed for sale on the world market for $1.2 million US. The tradgety [sic] of September 11, 2001 has produced a soft market which has lengthened the market time of the vessels."

Nancy Cook's Rule 1007-2 affidavit states: "The Debtor's assets are subject to a blanket lien in favor of a [sic] the Secured Lenders," who are identified in Exhibit B to her affidavit as Hudson, with a total lien of $3.2 million, and NRLP, with a total lien of $1 million. Schedule D to the Balco petition revealed that Hudson was a secured creditor with a claim for $3.4 million. According to Schedule D, Hudson's claim, which Balco indicated was disputed, was incurred September 23, 2003 and secured by "Mortgages, UCCs, etc." on "various" properties with a total value of $6 million. A second secured creditor, National Recovery Limited Partnership ("NRLP") was identified as having a disputed claim of $810,000 incurred on the same date on "various" properties with a total value of $6 million. Schedule D to the Haddon petition listed Hudson's claim as disputed, in the amount of $2,975,000 on account of "Forbearance Agreement" relating to "Extension of Loan and Credit Terms. Lien on all assets." NRLP was listed as having a disputed claim of $750,000. The same disputed amounts were listed in Schedule D to the Sarah petition on account of "9/03 Loan Extension".

Exhibit A to Nancy Cook's Rule 1007-2 affidavit listed the "Largest Known Unsecured Creditors As of March 31, 2004" as the following:

| | |
|---|---|
| MCM Works, Inc. | $ 22,460.00 |
| John Cook family Trust | $ 75,200.00 |
| James Wetzel | $ 44,710.00 |
| Joan Boehm | $ 82,000.00 |
| **D.P. Boehm** | **$114,000.00** |

---

[3]    This staggering figure requires the Court to comment that the affidavit has been correctly transcribed. Ms. Cook's affidavit really does indicate that the Debtors expended the value of the *Robust* 15 times over in efforts to renovate it.

- 7 -

(emphasis added).

Exhibit F to Nancy Cook's Rule 1007-2 affidavit listed the following "Senior Management": "Nancy Cook, President has been Officer for 2 years" and "Donald P Boehm Director, [Haddon] & [Sarah] for 7 years".

On April 5, 2004, an amended petition was filed in the Balco case by Ronald Cohen, amending the name of Balco's president in the petition to "Nancy Cook." (ECF Docket No. 3) Ronald Cohen signed the amended petition.

The Debtors' cases were procedurally consolidated by order dated April 8, 2004. (ECF Docket No. 14) Although Donald Boehm was identified as an unsecured creditor in Nancy Cook's affidavit, he was not listed in the first Schedule F filed on April 20, 2004 as part of each of the Debtors' Chapter 11 petitions.

Thereafter, on May 3, 2004, amended petitions were filed for each of the Debtors (ECF Docket Nos. 59 (in the Balco case), 11 (in the Haddon case), and 11 (in the Sarah case)). It appears that for each Debtor an amended petition and full set of schedules and financial affairs was filed as one document, and then certain separate amended schedules, which appear to be duplicates, were filed for each Debtor simultaneously, all in the Balco case (*See* (ECF Docket Nos. 60, 61, 62, 63, 64, 65, 66, 67 and 68). Nancy Cook signed the Balco petition as president and the Haddon and Sarah petitions as director; Mr. Cohen signed the Balco petition as Debtors' counsel, and Mr. Wulfman signed the Haddon and Sarah petitions. The following new information appeared in the amended petitions and schedules:

> – A post office box in Newburgh, New York, was listed as the new mailing address for each of the Debtors. The address listed for Donald Boehm on each Schedule F is the same Newburgh post office box.[4]

---

[4]    The same street address (120 Quassaick Avenue in New Windsor, New York) and post-office box address were listed for Donald Boehm in his personal bankruptcy filing. *See* Chapter 7 Case No. 05-35105, ECF Docket No. 1.

- The third amended petition in the Balco case listed the "Cook Family Trust" as holding a $277,000 unsecured claim.

- Haddon's amended Schedule F listed a $2.4 million unsecured claim in favor of Donald P. Boehm. Eight other claims ranging in value between $65.40 and $44,700 were marked "disputed". The only other undisputed claim in Haddon's Schedule F was for the "Warmers Family Trust c/o Antonina Campbell" in the amount of $1,266,080.00. Amended Schedule H listed the following co-debtors: Balco, the Cook Family Trust, Donald Boehm, Joan Boehm and Sarah.

- Sarah's amended Schedule F listed a $1.8 million unsecured claim in favor of Donald P. Boehm; only five other secured claims were listed in Sarah's Schedule F – all disputed and the largest for $10,507.96. Amended Schedule H listed Balco, the Cook Family Trust, Donald Boehm, Haddon and Joan Boehm as co-debtors.

On May 4, 2004, a two-page document captioned "Delete the following creditors" was filed concerning the Balco case. (ECF Docket No. 69) On May 7, 2004, a second document captioned "Delete the following creditors" was filed by Ronald Cohen concerning the Balco case. (ECF Docket No. 80) The second document purported to delete Donald Boehm as a creditor of Balco, although Boehm was never listed as a creditor in the schedules filed in the Balco case. On May 27, 2004, a document captioned "Delete the following creditor," referring to Donald Boehm, was filed by Ronald Cohen in the Haddon and Sarah cases (in each case, ECF Docket No. 12).

Proofs of Claim have been filed by the following parties:
- Donald Boehm filed unsecured claims in each case on August 20, 2004, for "money loaned". Boehm filed a claim for $128,908 against Balco, $2,400,000 against Haddon, and $1,800,000 against Sarah.
- The Cook Family Trust filed an unsecured claim of $277,000 for "money loaned" in the Balco Case.
- The Frederic Warmers Estate filed secured claims for $1,420,000 and $1,266,079.50 in the Balco Case.

**B.**    **Chapter 11 Activity**

    **1.**    **The Financing Motion**

On April 13, 2004 the Debtors filed an "Emergency Motion for (A) Interim and Final Orders, Under 11 U.S.C. §105, 361, 362, and 364, Approving Postpetition Financing and Related Relief" (ECF Docket No. 29; hereafter, the "Financing Motion"). The Financing Motion sought approval of a $250,000 revolving credit agreement from a proposed lender identified as Total Leasing, Inc. On April 14, 2004 (ECF Docket No. 36), the Court authorized the Debtors to borrow $25,000 on an interim basis, the amount necessary to meet payroll and maintain insurance coverage on the *Robust*; the interim amount was increased to $32,700 by order dated May 6, 2004 (ECF Docket No. 75). On May 5, 2004, supplemental affidavits in support of the Financing Motion were submitted by Andrew Wulfman and by Donald Boehm. (ECF Docket No. 70) Boehm submitted a 13-page affidavit and various exhibits, identifying himself as the officer of Balco and the Director of Haddon and Sarah. On May 12, 2004, Hudson and Epic Orange filed opposition to the Financing Motion. (ECF Docket Nos. 82 and 83, respectively) A further hearing to consider post-petition financing was held on May 13, 2004 and concluded with Hudson's agreement to advance $13,700 in order to cover the current payroll.

    **2.**    **The Lift-Stay Motion Regarding *Dauntless* and *Robust***

Hudson filed a motion for relief from the automatic stay on April 28, 2004 (ECF Docket No. 51; hereafter, the "Lift-Stay Motion"). Hudson claimed it was owed $3 million by the Debtors in connection with several loans, and that the collateral was secured by mortgages on the *Robust*, the *Dauntless*, the New Windsor Property, as well as Donald Boehm's personal residence. Hudson also alleged that in September 2003, after Haddon and Sarah defaulted under the loans, Haddon, Sarah, Balco, Donald Boehm, Joan Boehm and Boehm Marine Transport,

Inc. entered into a Forbearance Agreement with Hudson pursuant to which Hudson agreed to

forbear from pursuing its remedies under the various loans through March 31, 2004. The

Forbearance Agreement (annexed as Exhibit N to the Lift-Stay Motion) was signed by Nancy

Cook and Donald Boehm. The expiration of the Forbearance Agreement precipitated the

Debtors' March 31, 2004 bankruptcy filing.

Notwithstanding the fact that objections to the Lift-Stay Motion were required to be filed

by May 13, 2004, the Debtors did not formally oppose the Lift-Stay Motion until May 17, 2004,

the day before the scheduled hearing date on the Lift-Stay Motion. (ECF Docket No. 92) The

Debtor's opposition took the form of a 21-page affidavit signed by Donald Boehm.

The Court presided over lengthy evidentiary hearings on May 18, 2004 and May 28,

2004. The Debtors' principal witness as these hearings was Donald Boehm. At the conclusion

of the hearings, the Court determined that cause existed to lift the stay under 11 U.S.C. §

362(d)(1), primarily due to (i) Debtors' failure to offer Hudson any adequate protection,

combined with (ii) Debtors' lack of any means of paying for the constant maintenance required

to sustain seagoing vessels, including provision of a crew and the supplies necessary for their

sustenance, together with (iii) the lack of any evidence, beyond speculation and conjecture, of a

reorganization in prospect. *See In re Balco Equities Ltd.*, 312 B.R. 734 (Bankr. S.D.N.Y. 2004).

An order lifting the automatic stay was entered on June 2, 2004. (ECF Docket No. 117)

### 3.  Donald Boehm's Contempt and Non-Compliance

Hudson also sought and obtained a discovery order pursuant to Rule 2004 of the Federal

Rules of Bankruptcy Procedure on April 28, 2004. (ECF Docket No. 52) The Rule 2004 order

authorized issuance of a subpoena for the deposition of Donald Boehm. The Rule 2004

examination was rescheduled twice due to Boehm's failure to appear. Boehm also failed to

appear at the meeting of creditors pursuant to 11 U.S.C. § 341(a), in spite of the United States

Trustee's specific request that he attend the examination.

On June 8, 2004, Hudson filed a motion for contempt (ECF Docket Nos. 119, 120, 121)

against Boehm for removing certain items from the *Dauntless*, including two small boats (called

dories), tools, manuals, deck furniture, "various pieces of artwork", and charts and blueprints

from the pilothouse, all in violation of this Court's restraining order dated May 27, 2004 (ECF

Docket No. 114). By order dated August 6, 2004 (ECF Docket No. 178), this Court held Boehm

in contempt of the May 27, 2004 restraining order. On August 11, 2004 (ECF Docket No. 183)

Hudson made a further motion for contempt based on Boehm's removal of items from the

*Dauntless* and refusal to return them in spite of the contempt order and restraining order. On

September 3, 2004 (ECF Docket No. 205) this Court issued an order holding Boehm in contempt

of the August 6, 2004 order and assessing a $1,000 per day *per diem* fine against Boehm until he

purged his contempt. A further contempt order against Boehm was issued by this Court on

September 21, 2004 (ECF Docket No. 210). It is not clear whether Boehm ever fully purged his

contempt, and this is an issue that is currently being litigated in an adversary proceeding

commenced by Hudson objecting to Boehm's discharge (*See Hudson United Bank v. Boehm*,

Adv. Proc. No. 05-9106) in Boehm's personal bankruptcy case, initially filed in this Court as a

Chapter 11 case on January 17, 2005 (under Case No. 05-35105) and subsequently converted to

Chapter 7 on April 19, 2005.

4.    **Efforts to Reject Epic Orange Contract**
      **And Sell the New Windsor Property** [5]

Pursuant to a pre-petition contract dated April 17, 2003, the Debtor agreed to sell the New Windsor Property to Epic Orange for $1.1 million (with a possible price adjustment if Epic Orange received approval to build more than 110 units on the property; in that case, the purchase price would have been the number of units multiplied by $10,000). The Epic Orange Contract was negotiated pre-petition by Cohen Estis on behalf of Balco.

From the very outset of this case, the Debtors indicated that the Epic Orange contract would be rejected so that the New Windsor Property could be sold to a higher bidder. The first contract from a purported higher bidder, originally represented in an affidavit by Boehm to be an "initial contract offer" to purchase the New Windsor Property "for cash at closing of $1.6 million, without contingencies with a proposed closing date within 90 days" (*see* "Affidavit of Donald Boehm in Opposition to HUB's Motion for Stay Relief"; ECF Docket No. 92, ¶ 46) was later revealed to be a mere option contract, unsigned, and containing many contingencies, including a contingency that the buyer's proposed development project be approved by the town of New Windsor and could be supported by the existing water system. (*See In re Balco Equities Ltd.*, 312 B.R. at 744).

The Debtor did not immediately seek to reject the Epic Orange Contract. Epic Orange eventually moved to dismiss the Debtor's case and attached evidence that the proposed purchaser referred to by Donald Boehm, Golden Triangle Developers LLC, was an entity formed by the Cohen Estis firm, and a corporation search revealed that "Ronald Jay Cohen," having the same address as the Cohen Estis firm, was designated as the person to receive process from the NYS Department of State. *See* June 7, 2004 Motion by Epic Orange "seeking entry of an order

---

[5]    The background information from this section was taken from *In re Balco Equities Ltd.*, 323 B.R. 85 (Bankr. S.D.N.Y. 2005).

denying the rejection of the Epic Orange, LLC contract dismissing the case as being filed in bad

faith, converting the proceeding to a Chapter 7 and having a trustee appointed, and for such other

and further relief as the Court deems appropriate" (ECF Docket No. 118, page 33).  At a hearing

on June 15, 2004, the Court denied Epic Orange's motion to dismiss the case, but set June 30,

2004 as the deadline by which the Debtors would be required to file a motion seeking to reject

the Epic Orange Contract, with failure to timely seek rejection resulting in the Epic Orange

Contract being "deemed assumed".[6]  The Debtor filed the rejection motion on July 1, 2004 (ECF

Docket No. 141), one day later than provided in the order, resulting in further delay and leading

to litigation in the form of Epic Orange's objection to the rejection motion being filed in

disregard of the Court's deadline (ECF Docket No. 144) and Debtor's motion dated July 14,

2004 "To Extend Time to File Motion to Reject Executory Contract Nunc Pro Tunc" (ECF

Docket No. 153; *see also* ECF Docket No. 160), which was opposed by Epic Orange (ECF

Docket No. 159).  The Court finally granted the Debtor's motion, on the grounds of excusable

neglect by the Cohen Estis firm, by order dated August 10, 2004 (ECF Docket No. 181).

The Debtor's motion to reject the New Windsor Property attached a contract of sale dated

June 14, 2004, with an individual known as Aric Valdman, for $1,450,000. (ECF Docket No.

141, Exhibit B).  By order dated November 23, 2004 (ECF Docket No. 239), the Court denied

Debtors' motion, without prejudice, after Valdman repeatedly failed to appear in Court or to

disclose financial information.

Upon conversion of the case to Chapter 7 (discussed below), the Chapter 7 Trustee

renewed the Debtor's motion to reject the Epic Orange Contract in favor of a sale of the New

Windsor Property to an entity known as Upstate Properties, L.L.C. for $1.5 million in cash.  By

---

[6]    After the Court's oral ruling on June 15, 2004, an order was settled by Epic Orange on June 22, 2004, for
signature June 29, 2004.

separate orders dated March 15, 2005, the Court granted the Chapter 7 Trustee's motion to reject

the Epic Orange Contract and authorized the sale of the New Windsor Property to Upstate

Properties, L.L.C. (ECF Docket Nos. 298 and 300, respectively; *see also In re Balco Equities*

*Ltd.*, 323 B.R. 85 (Bankr. S.D.N.Y. 2005)).

   The sale of the New Windsor Property was completed, and the Chapter 7 Trustee is

currently holding the proceeds.  Hudson and the Frederic Warmers Estate have asserted

mortgages against the proceeds from the New Windsor Property, and if valid, those mortgages

attach to the proceeds of sale.  The Chapter 7 Trustee commenced an adversary proceeding

against the Frederic Warmers Estate, seeking to avoid its mortgage against the New Windsor

Property pursuant to 11 U.S.C. § 544(a)(3)[7] and objecting to the Frederic Warmers Estate's proof

of claim. (Adv. Proc. No. 05-9005; hereafter, the "Warmers Adversary Proceeding").  One of the

claims made by the Frederic Warmers Estate in the Warmers Adversary Proceeding is that the

New Windsor Property was transferred to Balco by Donald Boehm for nominal consideration

and without permission while Boehm was the executor of the Frederic Warmers Estate.  Hudson

has intervened in the Warmers Adversary Proceeding, and the litigation is ongoing. *See* the

Court's March 29, 2006 Memorandum Decision Denying Motions for Summary Judgment and

Limiting Issues at Trial (Adv. Proc. No. 05-9005, ECF Docket No. 56).  Until the Warmers

Adversary Proceeding is resolved, it is not clear that the rejection of the Epic Orange Contract

and subsequent sale will yield any benefit to unsecured creditors of the Debtors' estates.

---

[7]    Under Section 544(a)(3), a bankruptcy trustee takes, as of the commencement of the case, the rights and
powers of a bona fide purchaser of real property from the debtor.

### 5.     United States Trustee's Motion to Convert to Chapter 7

On November 19, 2004, the United States Trustee moved to convert the Debtors' cases to Chapter 7 (ECF Docket No. 235). A hearing on the motion was scheduled for December 14, 2004. The United States Trustee's motion required responses to be filed not later than three business days prior to the motion. Notwithstanding, the Debtors filed opposition to the motion on December 13, 2004, the evening before the hearing (ECF Docket No. 242). As the Court noted then, the Debtors' late-filed opposition was another example of chronic tardiness and "reorganization by ambush" tactics utilized by Cohen Estis, beginning with the haphazard, multiple revisions of pleadings; the lack of preparation in defending the Lift-Stay Motion[8]; and the delay in prosecuting the motions to reject the Epic Orange Contract. The Court expressed frustration with the conduct of the Debtors, Mr. Boehm and Mr. Wulfman, in virtually every hearing in this case.

By order dated December 14, 2004 (ECF Docket No. 248), the Court converted the Debtors' cases to Chapter 7, for cause, citing a failure to timely file operating reports, the absence of a reasonable likelihood of reorganization, and delay prejudicial to creditors. Paul Banner was appointed as the Chapter 7 Trustee of the Debtors' estates.

---

[8]     *See, e.g.,* one of this Court's remarks in *In re Balco Equities Ltd.,* 312 B.R. at 754:

> A good deal of the Debtors' conduct during the course of this case has been regrettable. After 60 days in Chapter 11 the estate was in disarray, and the Debtors squandered many opportunities afforded them by this Court and by other parties in interest. For example, the Lift-Stay motion was adjourned numerous times, and each time the Court expressed its concerns to the Debtors; yet the Debtors were no better organized at the conclusion of the evidentiary hearing on May 28, 2004 than they were at the very first hearing on the motion.

**II.    Cohen Estis's Representation of the Debtors**

    **A.    Retention Application**

The application to retain Cohen Estis was filed on April 8, 2004 (ECF Docket No. 10)

and signed by Nancy Cook as President of Balco.  The retention application included the

"Affidavit of Ronald J. Cohen in Support of Application to Employ and Retain Cohen, Estis &

Associates, LLP as Counsel for Debtor and Debtor In Possession".  Ronald Cohen's affidavit,

submitted "to provide the disclosures required under section 329 of chapter 11 of title 11 of the

United States Code …, the rules of this Court, and Rules 2014(a) and 2016(b) of the Federal

Rules of Bankruptcy Procedure" stated the following:

> 3. [Cohen Estis] utilizes a number of procedures (the "Firm Procedures") to
> determine its relationships, if any, to parties that may have connections to a client
> debtor. In implementing such Firm Procedures, the following actions were taken
> to identify parties that may have connections to the Debtors and [Cohen Estis's]
> relationship with such parties:
>
>     a)  [Cohen Estis] requested and obtained from the Debtors a list of
> interested parties and significant creditors (the "Potential Parties-In-
> Interest"), which has been revised and supplemented from time-to-time.
> The Potential Parties-In-Interest include equityholders, officers, directors
> and major trade creditors.
>
>     **b)  [Cohen Estis] compared each of the Potential Parties-In-Interest to
> the names in its master database of current and former clients (the
> "Client Database"). The Client Database generally includes the name
> of each client, the name of the parties that are or were adverse to such
> client with regard to the subject of [Cohen Estis]'s retention, and the
> names of the [Cohen Estis] personnel who are or were primarily
> responsible for matters for such clients.**
>
>     **c)  A conflicts check was issued and an investigation performed to
> determine whether there were any connections between [Cohen Estis]
> and any of the Potential Parties-in-Interest as such connection may
> relate to the Debtors.**
>
>     **d)  Known connections between [Cohen Estis] and Potential Parties-
> In-Interest were compiled for purposes of preparing this Affidavit.**
>
>     **4. As a result of the foregoing procedures, I have ascertained that, upon
> information and belief, [Cohen Estis] has no connections with the Debtors
> and the Potential Parties-In-Interest except as follows:**

a) Because of its broad-based general practice, [Cohen Estis] has appeared in the past and may appear in the future in cases unrelated to this chapter 11 case where one or more of the Potential Parties-In-Interest may be involved

b) Prior to the Petition Date, [Cohen Estis] represented certain of the Debtors with respect to providing counsel for certain transactions, and has also provided general restructuring advice and provided legal counsel with respect to organizing and preparing for the filing of these cases.

c) **[Cohen Estis] has not represented any Potential Parties-In-Interest.**

d) Certain members of [Cohen Estis] and certain associates of and "of counsel" attorneys to [Cohen Estis], and certain of such persons' relatives may have familial or personal relationships with officers, directors and/or shareholders of creditors of the Debtors, competitors of the Debtors and/or other parties in interest in these cases. As of the date hereof, [Cohen Estis] is not aware of any such relationships.

e) Certain members of [Cohen Estis] and certain of the associates of and "of counsel" attorneys to [Cohen Estis], and certain of such persons' relatives, may directly or indirectly be shareholders of creditors of the Debtors, competitors of the Debtors and/or other parties in interest. As of the date hereof, [Cohen Estis] is not aware of any such relationships.

f) Certain members of [Cohen Estis] and certain of the associates and "of counsel" attorneys to [Cohen Estis], and certain of their relatives, may have business, contractual, economic, familial or personal relationships with creditors of the Debtors and/or other parties in interest or such entities' respective officers, directors or shareholders. As of the date hereof, [Cohen Estis] is not aware of any such relationships.

5. I believe that none of the representations or relationships recited above would give rise to a finding that [Cohen Estis] represents or holds an interest adverse to the Debtors with respect to the services for which [Cohen Estis] would be retained.

6. Prior to the Petition Date, [Cohen Estis] provided legal counsel to certain of the Debtors with respect to certain business transactions in the ordinary course of their business. In addition, the Debtors engaged [Cohen Estis] to assist and provide legal counsel with respect to the interests of certain creditors and, ultimately, the commencement and prosecution of these chapter 11 cases. Accordingly, [Cohen Estis] is familiar with the Debtors' business and affairs.

7. **Neither I, [Cohen Estis], nor any member, counsel or associate of the Firm represent any entities other than the Debtors in connection with the Debtors' chapter 11 cases.** In addition, except as set forth herein, to the best of my knowledge, after due inquiry **neither I, [Cohen Estis], nor any member or counsel, or associate of the Firm represent any party in interest other than the Debtors in these chapter 11 cases.**

8. **[Cohen Estis] is a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code**, as modified by Section 1107(b) of the Bankruptcy Code, in that [Cohen Estis], its members, counsel, and associates:

a) are not creditors, equity security holders or insiders of the Debtors; and

b) are not and were not, investment bankers for any outstanding security of the Debtors.

c) have not been within the past three years investment bankers, or attorneys for investment bankers in connection with the offer, sale or issuance of a secureity [sic] of the Debtors.

d) are not and were not, within two years before the date of this affidavit, a director, officer, or employee of the Debtors or of an investment banker specified in "(b)" or "(c)".

e) **do not have an interst [sic] materially adverse to the interest of the estate or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interst [sic] in, the debtor** or an investment banker specified in"(b)" or "(c)".

(emphasis added).

In reliance upon Cohen Estis's retention application and supporting affidavit, the Court retained Cohen Estis by order dated April 9, 2004 (ECF Docket No. 16). The retention order stated that Cohen Estis "shall be compensated in accordance with the Affidavit, annexed to the Application, subject to sections 330 and 331 of the Bankruptcy Code, such Federal Rules of Bankruptcy Procedure as may be applicable from time-to-time, the rules of this Court and such procedures as may be fixed by order of this Court" and that Cohen Estis "shall provide such additional disclosure as is necessary or appropriate."

Although Cohen Estis was relieved as counsel by stipulation dated March 3, 2005 (ECF Docket No. 295), Cohen Estis did not file a final fee application until November 14, 2005, after the Chapter 7 Trustee had commenced an adversary proceeding to recover the Retainer.

**B.    Subsequent Rule 2014 Disclosures**

In Ronald Cohen's Supplemental Rule 2014 Affidavit dated July 29, 2004 (ECF Docket

No. 171), Mr. Cohen disclosed that he provided tax consulting services to Aric Valdman, the

proposed post-petition purchaser of the New Windsor Property, when Mr. Cohen was a partner at

Jacobowitz and Gubits, LLP, the firm representing Epic Orange.

Ronald Cohen's "Second Supplemental Affidavit" (ECF Docket No. 241) was filed

December 8, 2004, less than a week before the Debtors' cases converted to Chapter 7.   The

Second Supplemental Affidavit was the first time that Cohen Estis acknowledged a connection

with Donald Boehm, the Frederic Warmers Estate, and other parties in interest.   The Second

Supplemental Affidavit revealed the following information concerning Cohen Estis's

connections with Boehm and the Frederic Warmers Estate:

- — Cohen Estis was retained to represent the Frederic Warmers Estate on March 23, 2003, while Donald Boehm was Executor of the Frederic Warmers Estate, "for the specific purpose of securing the pertinent information relating to the prior administration of the Warmers Estate and facilitating the submission of an accounting with respect to such periods." Second Supplemental Affidavit, ¶9.
- — Cohen Estis's representation of the Frederic Warmers Estate ended when Boehm was removed as executor in October 2003. *Id.* at ¶12.
- — After Boehm was removed as executor, Cohen Estis "continued to provide services in connection with the submission of a 'final' accounting with respect to the prior administration of the Warmers Estate" (i.e., by Donald Boehm). *Id.* at ¶13. Cohen Estis filed an amended final accounting with the Surrogate's Court on March 8, 2004.
- — Subsequent to the commencement of these bankruptcy cases, Cohen Estis continued to "provide additional legal services supplemental to the submission of the Accounting, in proceedings before the Surrogate's Court." *Id.* at ¶14. As of the date of the Second Supplemental Affidavit, "[t]hose proceedings remain outstanding." *Id.*
- — Cohen Estis "applied to the Surrogate's Court for an [sic] reimbursement of counsel fees incurred on behalf of the Warmers Estate." *Id.* at 16.  According to the Second Supplemental Affidavit: "As of August 11, 2004, the fees and expenses sought to be awarded to [Cohen Estis] total approximately $28,000.00." *Id.*

  – Cohen Estis explained that although the Frederic Warmers Estate had been
    scheduled as a creditor of Haddon in May 2004, "at that time the significance
    of that information for the purposes of compliance with the disclosure
    requirements of 2014 at that time was not recognized." *Id.* at 19.

The Chapter 7 Trustee has further alleged that: "Cohen Estis appeared in Surrogate's Court

proceedings respecting the Warmers Estate on June 19, 2003, July 24, 2003, September 12,

2003, November 6, 2003, December 11, 2003, February 5, 2004, and March 8, 2004, in response

to allegations of Boehm's breach of fiduciary duties and attempts to obtain an accounting

instituted by certain beneficiaries of the Warmers Estate." (ECF Docket No. 320, ¶2(b))

      Cohen Estis also revealed that it represented "certain third parties who are 'parties-in-

interest' or 'related' to parties in interest," but, in Cohen Estis's view, the representation was "in

connection with certain transactions and/or legal proceedings which are completely unrelated to

these bankruptcy proceedings." (ECF Docket No. 241 at ¶24 (emphasis in original)).  Cohen

Estis identified the following:

  – "Representation of the Tessie Warmers Trust in connection with the sale
    of certain real estate holdings", (ECF Docket No. 241, ¶24(a))  In a
    footnote to the disclosure, Cohen Estis added: "[Cohen Estis] served as
    counsel to the Tessie Warmers Trust in connection with the sale by the
    Trust of certain commercial real estate located in Manhassat [sic], Long
    Island.  This engagement commenced on or about January 20, 2004 and
    concluded on or about April 30, 2004.  Throughout [Cohen Estis's]
    representation of the Trust, Mr. Boehm served as trustee thereof.  To the
    best of my knowledge, the Tessi [sic] Warmers Trust holds no claim
    adverse to the Debtors' bankruptcy estates."

  – "Representation of, LMAD, Inc., (General Partner of Senlar Associates,
    NY General Partnership), Connelly Industries, Inc., and Donald Boehm,
    individually, in the case *DeBrizzi et al. vs. Senlar Associates, et als.*, Index
    No. 5854/99, State Of New York Supreme Court, Orange County." *Id.* at
    ¶24(b).  Cohen Estis added the following footnote to the disclosure: "This
    action was commenced in or about 1999.  [Cohen Estis] first became
    involved in the action in or about November, 2003, substituting in as
    counsel for the defendants after final judgment had been entered in that
    matter.  [Cohen Estis's] representation of the defendants in that case is
    continuing in connection with the enforcement of court orders and
    judgments.  To the best of my knowledge, the entirety of the matters at
    issue in that action are unrelated to these bankruptcy cases.  Other than

- 21 -

Mr. Boehm's relationship to the Debtors, I am not aware that any of the other parties to that case have any claim or interest in these bankruptcy cases." The Chapter 7 Trustee later amplified this disclosure with the following allegations:

> In addition to representing Donald Boehm in connection with the Warmers Estate, Cohen Estis also undertook (in November, 2003) the representation of Boehm and two entities he owns – LMAD, Inc. and Connelly Industries, Inc. – in proceedings in New York State Supreme Court arising out of alleged breach of fiduciary duties by Boehm in connection with the assets of Senlar Associates.
>
> Of particular note is a decision in the Senlar matter rendered August 22, 2003, wherein the Supreme Court justice found Boehm in contempt of court for transferring $96,000.00 to Connelly Industries, and then having Connelly transfer most of that ($88,200.00) to Haddon Holdings.

(ECF Docket No. 320, ¶2 (e) & (f))

— Representation of Donald Boehm in proceedings to foreclose his interest in his personal residence in New Windsor, New York. (ECF Docket No. 241, ¶24(c)). Cohen Estis added that it was first consulted on the matter on March 1, 2004 but did not appear in the case or file papers until August 2004. Cohen Estis later noted in its fee application that it undertook this representation "under the rationale that this was a mortgaged asset under the Hudson United Bank reaffirmation agreement executed by the corporate debtors," and Cohen Estis believed that completion of the foreclosure would have constituted an event of default. (ECF Docket No. 314, ¶42)

## C.    Cohen Estis's Receipt of the Retainer

### *The Retention Application*

The Affidavit of Ronald Cohen, submitted with the application to employ Cohen

Estis (ECF Docket No. 10), also discussed the compensation received by Cohen Estis:

> This Affidavit is intended to comply with Federal Rule of Bankruptcy Procedure 2016(b). **[Cohen Estis] received prepetition retainer in the amount of $3,000, which it intends to apply to postpetition fees and expenses allowed by this Court. A precise disclosure of the application of the prepetition retainer and amounts held as of the Petition Date will be supplied in [Cohen Estis's] interim fee application for its postpetition services and expenses to be rendered or incurred for or on behalf of the Debtors.** No promises have been received by [Cohen Estis] or by any member or associate thereof as to compensation in connection with these cases other than in accordance with the

- 22 -

provisions of the Bankruptcy Code. [Cohen Estis] has no agreement with any other entity to share with such entity any compensation received by [Cohen Estis].

Neither I, [Cohen Estis], nor any member or associate thereof, insofar as I have been able to ascertain, represents any interest adverse to the Debtors or the Debtors' estates in the matters regarding which [Cohen Estis] is to be engaged. Except as may be stated above, I believe [Cohen Estis] is a "disinterested person" as that term is defined in section 101(14), as modified by section 1107(b), of the Bankruptcy Code.

By reason of the foregoing, I believe [Cohen Estis] is eligible for employment and retention by the Debtors pursuant to sections 327 (as modified by section 1107(b)) and 328 of the Bankruptcy Code and the applicable Bankruptcy Rules.

(emphasis added).

### Story #1: The Engagement Letter

The Debtors formally retained Cohen Estis by a March 31, 2004 letter agreement (the "Engagement Letter") signed by Ronald Cohen on behalf of Cohen Estis; Nancy Cook on behalf of Balco, Haddon and Sarah, and as a guarantor individually and on behalf of the Cook Family Trust; and Donald Boehm on behalf of Haddon and Sarah, and as a guarantor individually and on behalf of Connelly Industries, and "as Trustee of a certain Undisclosed Trust". In the Engagement Letter, Cohen Estis recited the following:

Since we have been authorized to commence providing services to the entities and because this matter involves three Bankruptcy filings we **require a retainer in the amount of $45,000.00**, to be paid $3,000 and (____) today March 31, 2004 (for the filing fees @ 3 cases at $840.00 each $2,520.00 and $480.00 as a first installment towards legal fees) plus $_____ **and the balance within forty-five (45) days** by the Guarantors of the obligations set forth herein. All obligations of the Guarantors are joint and several. **We understand that one of the Guarantors, Connelly Industries, Inc. has agreed to assign to us the balance of the retainer due us (to the extent not paid by the other Guarantors) out of the proceeds it expects to receive out of a payment due it under a certain contract of sale for a certain Burger King restaurant in Nassau County, New York scheduled to close on or about April 27, 2004, which we refer to as the "Petrakis Contract"**. Notwithstanding the foregoing, Donald P. Boehm, individually and as trustee of a certain undisclosed trust, Nancy M. Cook, Nancy M. Cook as the trustee of the Cook Family Trust and Connelly Industries, Inc. have agreed to jointly and severally guarantee the obligation of Cohen, Estis & Associates, LLP to remit the balance due our law office of the $45,000.00 retainer fee. If the Bankruptcy Cases are dismissed

- 23 -

(Voluntarily or Involuntarily) within 90 days from the date of filing March 31, 2004, it is understood that the retainer due Cohen, Estis and Associates, will be reduced to actual legal costs incurred during the time from March 24, 2004 (the approximate date that we seriously began discussing the Bankruptcy options) thru the date that the Bankruptcy case was dismissed or otherwise settled. We point out that a decision to file the Bankruptcy Petition [sic] was not made until today and we have done everything humanly possible to file the three (3) Petitions in the fastest possible time frame. **As we have discussed we require the retainer payment to continue to prosecute this matter as you will require.**

(emphasis added). The Engagement Letter was first provided to the Court as Exhibit A to the

Chapter 7 Trustee's objection to the Cohen Estis fee application (ECF Docket No. 320).

### *Story #2: The First Rule 2016 Statement* [9]

Time records provided by Cohen Estis as part of its fee application include the following

time entry by Ronald Cohen for one hour, billed on April 25, 2004: "Discussion with Donald

Boehm as to our understanding of his concerns pertaining to the balance of the retainer fee in

light of emergencies ongoing; agreement to discuss at a leter [sic] time when things calmed

down[.]"

On May 3, 2004, Cohen Estis filed the "Disclosure of Compensation of Attorney for

Debtor(s) – Amended" filed pursuant to 11 U.S.C. § 329(a) and Bankruptcy Code Rule 2016(b)

(ECF Docket No. 59; hereafter, the "First Rule 2016 Statement"). Although designated as an

"amended" statement, it does not appear that any previous disclosure was filed by Cohen Estis in

---

[9] Rule 2016(b) of the Federal Rules of Bankruptcy Procedure requires:

**(b) Disclosure of compensation paid or promised to attorney for debtor**

Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

these cases. According to the First Rule 2016 Statement, which was signed by Ronald Cohen, as

of the date of the statement Cohen Estis received $3,000, which was paid by the Debtor. The

First Rule 2016 Statement also indicated a "Balance Due" of $42,000 and stated that the source

of compensation to be paid was "Nancy Cook, Cook Family Trust, Donald Boehm."

### Story #3: The Second Rule 2016 Statement

On May 11, 2004, Cohen Estis filed an amended Rule 2016 statement (ECF Docket No.

84; hereafter, the "Second Rule 2016 Statement"). The Second Rule 2016 Statement, also signed

by Ronald Cohen, indicates the following:

**DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S) - AMENDED**

1. Pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b), I certify that I am the attorney for the above-named debtor and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

For legal services, I have agreed to accept $ 45,000.00

Prior to the filing of this statement I have received $ 45,000.00

Balance Due $ 0.00

In the Second Rule 2016 Statement Cohen Estis indicated that "[t]he source of the compensation

paid to me was: . . . Donald Boehm; payment was received April 29, 2004" and that "[t]he source

of compensation to be paid to me is . . . Debtor."

As of the date of this opinion, the Second Rule 2016 Statement has not been amended.

As discussed below, and notwithstanding the Second Rule 2016 Statement, Cohen Estis now

claims that it never received the amounts disclosed in the Second Rule 2016 Statement for

services rendered or to be rendered in the bankruptcy case, and that the Retainer was merely an

"internal credit".

***Story #4: The Fee Application***

Cohen Estis first claimed that it never actually received the Retainer in its November 11, 2005 fee application, 18 months after filing the Second Rule 2016 Statement. In its fee application, Cohen Estis explained:

> We represented the Tessie Warmers trust in its successful efforts to sell a parcel of underperforming improved real property, located in Hempstead, New York for the sum of $1,400,000.00. The negotiated sales price was several hundred thousand dollars in excess of the appraised value of the property. Under the trust agreement Donald Boehm was not a beneficiary and had no pecuniary interest. A copy of the trust agreement is annexed as Exhibit F. The transaction closed in late April, 2004. The Cohen firm was paid the sum of $68,000.00 for handling this complex transaction by the Trust. The fee earned was attributable to (a) real estate counsel services; (b) tax services, and (c) deal structuring services. The Cohen firm had requested a fee in excess of $100,000.00 in this matter. To the best of our knowledge the Tessie Warmers trust has no relationship of any kind to the debtor and therefore there was no duty to make any disclosure to this Court pertaining to that matter. . . . **When the emergency Bankruptcy filings became necessary, we further agreed to allow $ 42,000 of the fee on the compromised amount to be used as a retainer on the Bankruptcy**. A reason why this was done was to assure Mr. Wulfman that he would receive appropriate credit towards his compensation for working on the Bankruptcy matters.

(ECF Docket No. 314, ¶41 (emphasis added)). Cohen Estis did not explicitly disclose in the fee application that Donald Boehm was the Trustee of the Tessie Warmers Trust, and that it was Boehm who retained the Cohen Estis firm to represent the Tessie Warmers Trust. Cohen Estis did not disclose, and it has never reconciled the apparently inconsistent recitation in the Engagement Letter that, "We [Cohen Estis] understand that one of the Guarantors, Connelly Industries, Inc. has agreed to assign to us [Cohen Estis] the balance of the retainer due us (to the extent not paid by the other Guarantors) out of the proceeds it expects to receive out of a payment due it under a certain contract of sale for a certain Burger King restaurant in Nassau County, New York scheduled to close on or about April 27, 2004. . . ." Connelly Industries is a

- 26 -

corporation owned by Donald Boehm. Thus, it is unclear whether the Retainer was received as a fee from the Tessie Warmers Trust, or from Connelly Industries, or from someone else.

### The $68,500 Check

The "Supplemental Statement Submitted by Cohen, Estis and Associates, LLP" dated March 17, 2006 (ECF Docket No. 325) attaches a copy of "the $68,500.00 check that was the legal fee paid from the escrow we were holding on the real estate transaction to our firm on April 27, 2004." The check is from Cohen Estis's IOLA account, Matter #8008 (later identified as "Donald Boehm / Burger King / commercial real estate matter number 8008"[10]) and made payable to Cohen Estis. Cohen Estis argues: "This is clearly a pre-petition fee earned on another matter not from the Debtor. If the Court orders these funds returned, we will only be returning the funds to ourselves." (ECF Docket No. 325, ¶15) The actual transferor of the $68,500 check to Cohen Estis is not identified. The Court observes that the check's date (April 27, 2004), amount ($68,500) and source of the payment (Cohen Estis) are each inconsistent with the date (April 29, 2004), amount ($45,000) and source (Donald Boehm) identified in the Second Rule 2016 Statement. In these circumstances, and with no other supporting evidence, the fact that Cohen Estis wrote a check to itself from its IOLA account is virtually meaningless.

### Ronald Cohen's Rule 2004 Testimony [11]

In Cohen Estis's "Supplemental Statement," Mr. Cohen urged: "At the very least, I ask the Court to read the deposition transcripts from the Rule 2004 examinations conducted by the Chapter 7 Trustee and Hudson United Bank. I testified for over two (2) hours in those examinations and more fully explained the behind-the-scenes work that our firm was doing." (ECF Docket No. 325) The Court has reviewed the excerpts of the Rule 2004 examination

---

[10]    ECF Docket No. 328, Ex. A, p. 75.

[11]    Fed. R. Bankr. P. 2004

provided by Cohen Estis in a further pleading submitted by Cohen Estis on March 31, 2006

(ECF Docket No. 328, Ex. A). In the Rule 2004 examination, conducted January 6, 2006, Mr.

Cohen provided the following elaboration concerning the $68,500 check from Cohen Estis's

IOLA account:

> Q. [Unidentified]: Do I understand it that the funds that were applied to the fee for
> the bankruptcy case are fees that you earned in connection with the sale of this
> Burger King property?
>
> MR. COHEN: My fee for handling the Burger King transaction was $68,500.00.
> That was my fee. That money was paid to me. Donald Boehm indicated to me
> that he had a financial problem and what I agreed to do was to credit as against
> the bankruptcy case the sum of $42,000.00 in a totally independent credit
> transaction.
>
> Q: Was there ever any understanding with Mr. Boehm that at some point in the
> future you would be paid in full for the work that you did on the sale of the
> Burger King property?
>
> MR. COHEN: I was paid in full for the Burger King property.
>
> Q: But it appears that if you credit $42,000.00 of that to work in the bankruptcy
> case, somebody is still owed money. It appears the firm would still be owed
> money for work that was done.
>
> MR. WEISZ (counsel to Cohen Estis): Objection. Assumes facts not in evidence
> but I think the balance of the Affidavit talked about Mr. Wulfman's – that is really
> the issue here. Why don't you explain that issue.
>
> MR. COHEN: I will explain what happened. Donald Boehm was in severe
> financial difficulty. He was originally supposed to pay $50,000.00 if we were
> going to do a bankruptcy. He negotiated that fee down from 50 to 45,000. He
> was originally supposed to pay $110,000.00 in the Burger King transaction as
> Trustee of the Trust. He negotiated that down. I agreed to accept the [$68,500]
> as a reduction of my fee in that transaction. Because he had a major financial
> problem and because I was optimistic that we would be able to put a restructuring
> plan together dealing with these millions of dollars of assets, I felt that question
> would be successful and that we would put a fee application in at the conclusion
> of the bankruptcy case and we would be paid. I needed Mr. Wulfman to work on
> the bankruptcy case because he was the only bankruptcy attorney in the office. I
> wasn't well at that point in time and Mr. Wulfman had a financial relationship
> with our office that part of his salary was a bonus arrangement based upon cash
> collections and productivity. So, in order to get Mr. Wulfman to work on the
> Balco bankruptcy case, I had to do an internal credit in our accounting system in
> the office because Boehm didn't have the capacity to pay the $42,000.00 but what
> I agreed to do between Mr. Wulfman and Mr. Boehm is I agreed to credit out
> $42,000.00, which I did. I applied it to Mr. Wulfman's quote internal account

with our office so he would get credit for $42,000.00 of legal work and when we
submitted the fee application, obviously, we took a credit against our full fee that
we had hoped to receive to the extent of that $42,000.00. That is what took place.

(ECF Docket No. 325, Ex. A, p. 77-80) The Rule 2004 testimony quoted above does not reflect

whether the $68,500 fee was paid to Cohen Estis by Donald Boehm, Connelly Industries, the

Tessie Warmers Trust, or some other person or entity.

The Tessie Warmers Trust and its beneficiaries have sought permission to intervene in

this adversary proceeding,[12] claiming that it should receive the Retainer disgorged from Cohen

Estis. The Tessie Warmers Trust alleges:

> As background, prior to April 27, 2004, the Trust owned property located
> at 500 Fulton Avenue, Hempstead, New York which was leased by a Burger King
> and generating substantial income for the Trust beneficiaries. On April 27, 2004,
> Donald Boehm, as Trustee of the Trust, sold the Hempstead property without the
> knowledge or consent of the beneficiaries. Mr. Boehm apparently retained Cohen
> to represent the Trust in this matter. However, even though Cohen was aware of
> Donald Boehm's fiduciary duties as Trustee of the Trust, he assisted in
> negotiating a contract whereby Boehm would personally benefit as a "leasing
> agent" and Boehm's alter-ego, Connelly Industries, would receive substantial
> sums of money as a "third party vendor."
>
> Cohen charged the Trust the sum of $68,500.00 in alleged legal fees for
> this fairly standard commercial real estate transaction. However, from a review of
> the documents filed by Cohen, it appears that the legal fees charged to the Trust
> may have been inflated so that Donald Boehm and his related entities would have
> sufficient cash to fund the retainer for his bankruptcy filings. This breach of
> fiduciary duty and diversion of assets by Cohen is being pursued by the Trust
> in State Court proceedings. In any event, it appears by all of the admissions that
> the $42,000.00 retainer fee never belonged to the Debtors and is not now part of
> the bankruptcy estate.

(Adv. Proc. No. 05-9045, ECF Docket No. 9)

---

[12]    The Motion to Intervene has been adjourned from time to time and is currently returnable July 25, 2006.

**D.    The Adversary Proceeding**

On August 30, 2005, the Chapter 7 Trustee filed a complaint (Adv. Proc. No. 05-9045; ECF Docket No. 1), captioned as a "Complaint to Recover Money". The Chapter 7 Trustee demanded that Cohen Estis account for and disgorge the Retainer for (1) failure to disclose connections with Boehm and the Frederic Warmers Estate until December 8, 2004, when the Second Supplemental Affidavit was filed, and (2) failure to apply to the Court for allowance of fees as required by the terms of the retention order and Bankruptcy Code Section 330.

Cohen Estis filed an answer on September 16, 2005 (ECF Docket No. 4). Cohen Estis admitted that no fee application had ever been filed. *Id.*, ¶20. Cohen Estis claimed that it disclosed connections to Boehm and the Frederic Warmers Estate in paragraphs 4(a) and 5 of the April 7, 2004 affidavit of Ronald Cohen. In the paragraphs Cohen Estis relies upon, Ronald Cohen stated:

> 4. As a result of the foregoing procedures, I have ascertained that, upon information and belief, [Cohen Estis] has no connections with the Debtors and the Potential Parties-In-Interest except as follows:
>
> > (a) Because of its broad-based general practice, [Cohen Estis] has appeared in the past and may appear in the future in cases unrelated to this chapter 11 case where one or more of the Potential Parties-In-Interest may be involved
> > * * *
>
> 5. I believe that none of the representations or relationships recited above would give rise to a finding that [Cohen Estis] represents or holds an interest adverse to the Debtors with respect to the services for which [Cohen Estis] would be retained.

The parties agreed that the most efficient way to resolve the adversary proceeding would be in the context of a fee application by Cohen Estis, to which the Chapter 7 Trustee and other parties in interest could object.

E.    **The Fee Application**

Cohen Estis's first and final fee application, signed by Ronald Cohen as the firm's

managing partner, was filed on November 14, 2005 (ECF Docket No. 314). Of the total of

487.83 hours of work billed in the case by Cohen Estis, 292.55 were performed by Andrew

Wulfman. Ronald Cohen billed the second highest total, 64.48 hours. Mr. Cohen stated that

"Andrew Wulfman was a senior associate attorney employed by Cohen Estis and Associates,

LLP to manage the firm's bankruptcy practice," and that Mr. Wulfman "with over 15 years of

experience as an attorney was deemed by the firm to be the most qualified attorney in the office

to handle the Cohen firm's bankruptcy matters." *Id.*, ¶13. Mr. Cohen also stated:

> There are other additional circumstances that the court needs to be aware of in
> evaluating this fee application. First, managing partner Ronald Jay Cohen had
> been diagnosed as a diabetic in January 2004 and the diabetic condition
> throughout the Spring of 2004 resulted in severe limitations on his capacity to
> perform the full range of his customary legal services due to drastic problems
> with his vision. Mr. Wulfman was therefore a very important attorney in the
> overall mix of the Cohen, Estis practice and heavily relied upon, particularly with
> the health issues Mr. Cohen was confronted with and the need for Mr. Wulfman
> to manage the Bankruptcy case. By late December, 2004 the Cohen Firm and Mr.
> Wulfman had a parting of the ways.

*Id.* at ¶47.

The fee application also summarized the major projects that Cohen Estis undertook on

behalf of the Debtors during the Chapter 11 case, including "Preparation of the Bankruptcy

Petition, Emergency Filing and Information Gathering," "Emergency Business Operations,"

"Emergency Financing," "Retention of Other Professionals," "Motion to Reject Contract," and

"Efforts to Sell Assets." As discussed above, every one of the Debtors' efforts in Chapter 11

were ultimately unsuccessful and marked by procedural errors and complications, as well as

significant substantive problems. The largest portion of the fee application was devoted to a

description of Ronald Cohen's efforts to market the New Windsor Property. Although the

property was ultimately sold by the Chapter 7 Trustee to Upstate Properties USA, LLC, the

buyer originally made the offer to the Debtors prior to conversion of the case (ECF Docket No.

255, Ex. A). Cohen Estis argues:

> [Cohen Estis] believes that their substantial efforts of attempting to develop a
> sales plan for the debtors and help in selling the assets helped develop maximize
> [sic] the value of the New Windsor, New York real estate. This property was
> ultimately sold to Upstate Properties USA, LLC, a New York State Limited
> Liability company, with an office at Lee Avenue, (Williamsburg) Brooklyn, New
> York for $1,500,000.00 with the approval of this Court, an amount in excess of
> $400,000.00 over the original Epic Orange contract price. [Cohen Estis] used its
> numerous contacts in the Hassidic community in Williamsburg and Boro Park,
> Brooklyn, Monsey (Rockland) and Kiryas Joel (Orange County), to create a
> "buzz" pertaining to the New Windsor property. Applicant maintains that the
> ultimate purchaser being part of this insular Hassidic community demonstrates the
> reach of the buzz created ultimately benefiting the Estate, upon the sale of the
> New Windsor, New York property for $1,500,000.00, $400,000.00 higher than
> the price set forth in the 2003 Epic Orange contract.

ECF Docket No. 314 at ¶29.

Epic Orange, the Chapter 7 Trustee and the United States Trustee filed objections to the

award of any fees and expenses to Cohen Estis (ECF Docket Nos. 319, 320 and 322,

respectively), and requested disgorgement of the Retainer. More specifically, the U.S. Trustee

objected to the Cohen Estis fee application for failure to make appropriate and timely disclosures

pursuant to Fed. R. Bank. P. 2014(a); conflict of interest and lack of disinterest under 11 U.S.C.

§§ 328(c) 327(a) and 101(14); and to the extent the Court deems any award at all as appropriate,

excessiveness of fees sought and inadequate time records.

After initial hearing, the fee application was adjourned to allow Cohen Estis to respond to

the objections. Cohen Estis did so in a Supplemental Statement submitted by Ronald J. Cohen

on March 20, 2006 (ECF Docket No. 325). Mr. Cohen stated:

> I understand now that the disclosures my firm made in this case do not rise to the
> level of the disclosure expected by the Court as expressed by Judge Brozman in
> *Leslie Fay Companies, Inc.*, 175 B.R. 525 (Bkrtcy. [sic] S.D.N.Y. 1994). I
> believe that our firm has acted in the best interests of the estate and therefore,

> while a monetary sanction of some amount may be appropriate, our application
> for fees and disbursement should not be denied in full.

*Id.* at ¶2. Mr. Cohen repeated the statement that the firm relied upon Mr. Wulfman "to manage

the principal procedural aspects of the bankruptcy case" in view of Mr. Cohen's medical

condition. Mr. Cohen stated that he "relied upon [Mr. Wulfman] as a drafter, editor and

proofreader of all Affidavits I submitted to the Court in 2004." *Id.* at ¶5.

The Court ruled on April 11, 2006 that all professional fees should be denied to Cohen

Estis due to the multiple, untimely and incomplete disclosures in violation of Bankruptcy Rules

2014(a) and 2016(b) and Cohen Estis's lack of disinterestedness pursuant to 11 U.S.C. §§ 328(c),

327(a), and 101(14). The Court noted that, had appropriate disclosures been made when

required, the Court never would have authorized the retention of Cohen Estis as counsel for the

Debtors. The Court also directed that the Retainer be disgorged and held by the Chapter 7

Trustee in escrow pending further order of the Court.

F.    **The Reconsideration Motion**

Next Cohen Estis made a Motion for Reconsideration of the Court's order denying fees to

Cohen Estis and ordering disgorgement of the Retainer (ECF Docket No. 330; hereafter, the

"Reconsideration Motion").

The affidavit in support of the Reconsideration Motion was submitted by Deborah

Weisman-Estis, a member of the Cohen Estis firm, asking the Court to reconsider the April 11,

2006 ruling and April 26, 2006 order "on the grounds of manifest injustice". According to time

records annexed to the fee application, Ms. Weisman-Estis worked a total of one half-hour on

these matters on a single day, November 14, 2004.

Ms. Weisman-Estis states in her Affidavit: "I am disappointed that the Court has disposed

of our Fee Application and issued an Order requiring us to turn over monies to the Chapter 7

Trustee . . . without a full evidentiary hearing. I had planned on testifying at the hearing." Ms. Weisman-Estis speculated that "[t]he Court apparently believes that our firm had a long relationship with Donald Boehm," and that "the Court does not appreciate the amount of time and effort expended by numerous attorneys and support staff on this matter, nor the reliance by [Cohen Estis] and its Managing Partner, Ronald J. Cohen, on Bankruptcy Counsel Andrew S. Wulfman to guide us through all aspects of this matter, including, but not limited to, the requisite disclosures of the Bankruptcy Code that are required to be made by Debtor's counsel."

On the other hand, while making Mr. Wulfman the scapegoat for Cohen Estis's disclosure deficiencies, Ms. Weisman-Estis protests that "Andrew Wulfman's time was less than 60% of the attorney time our firm spent on this matter" and that the assistance from others in the firm "was more extensive than what is indicated in the invoice submitted with the Fee Application." Ms. Estis also argues that, "[f]or the Court to rely as the sole evidentiary proof on a certification prepared by Mr. Wulfman, and signed by Mr. Cohen when he was visually impaired, seems unfair."

According to Ms. Weisman-Estis's Affidavit, Cohen Estis has so far forwarded a check for only $513 to the Chapter 7 Trustee, notwithstanding the requirement in the Court's April 26, 2006 order that: "The balance of the $45,000.00 retainer, or the sum of $42,483.00, is directed to be disgorged by Cohen Estis and paid to Paul L. Banner, Chapter 7 Trustee herein, to be held by the Chapter 7 Trustee pending further orders of the Court to be entered in Adversary Proceeding No. 05-09045." (ECF Docket No. 329)

# DISCUSSION

## I.   Failure to Disclose

Bankruptcy Code Section 327(a) provides in relevant part that: "the trustee, with the court's approval, may employ one or more attorneys, accountants, auctioneers, or other professional persons, that do no hold or represent an interest adverse to the estate, and that are disinterested persons. . . ."

A "disinterested person," as the term is defined in Bankruptcy Code Section 101(14), means a person that:

> does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . ., or for any other reason[.]

Rule 2014(a) of the Federal Rules of Bankruptcy Procedure sets forth the requirements for any professional that seeks to be employed pursuant to Section 327(a). Rule 2014(a) requires:

> **(a) Application for an order of employment**
>
> An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327 . . .shall be made only on application of the trustee or committee. The application shall be filed and . . . a copy of the application shall be transmitted by the applicant to the United States trustee. The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, **to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest,** their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

(emphasis added). Failure to disclose direct or indirect relations to, connections with, or interests in the debtor violate Bankruptcy Code Section 327(a) and Bankruptcy Rule 2014.

The purpose of Rule 2014(a) is to provide the court and the United States trustee with information to determine whether the professional's employment is in the best interest of the estate.... Rule 2014 disclosures are to be strictly construed and failure to disclose relevant connections is an independent basis for the bankruptcy court to disallow fees or to disqualify the professional from the case.

*Exco Res., Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron Corp.)*, 2003 WL 223455 at *4 (S.D.N.Y. Feb. 3, 2003) (citations omitted).

All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light.... So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification.

*In re Leslie Fay Cos., supra*, 175 B.R. at 533 (citations omitted).

"At a minimum, failure to disclose is an exacerbating factor warranting the reduction or denial of fees for lack of disinterestedness.... Regardless of the precise application, wilful or intentional failure to disclose merits the harshest sanctions." *In re Granite Partners, L.P*, 219 B.R. 22, 41 (Bankr. S.D.N.Y. 1998) (citations omitted).

Courts have imposed a variety of sanctions based on a failure to make the required disclosures. The sanctions range from a denial of all fees, to a reduction of fees, to the imposition of economic sanctions.... If, however, the failure to disclose results in a professional being employed to perform services for which it is not eligible for retention under 11 U.S.C. § 327, denial of all fees for those services is required.... Similarly, all compensation should be denied to an attorney who willfully disregards his or her fiduciary obligations under the disclosure rules....

*In re Fretter, Inc.*, 219 B.R. 769, 776 -777 (Bankr. N.D. Ohio 1998) (citations omitted).

As set forth above, Cohen Estis does not dispute that it failed to adequately disclose its connections with parties in interest. The failure to disclose resulted in the employment of Cohen Estis as Debtors' counsel when it was not eligible for retention.

Although this alone is sufficient to deny all fees to Cohen Estis, the Court also believes

that the failure to disclose was deliberate.  The Seventh Circuit has observed:

> Before a bankruptcy court elects to award partial payment to a law firm or other
> professional that was improperly employed, it should consider whether the
> professional's failure to disclose was intentional. If any evidence exists to support
> an inference of intent, then the court should not fall prey to the professional's
> story of confusion, miscommunication, or negligence. We believe a bankruptcy
> court should punish a willful failure to disclose the connections required by
> Fed.R.Bankr.P. 2014 as severely as an attempt to put forth a fraud upon the court.

*In re Crivello*, 134 F.3d 831, 839 (7th Cir. 1998).

In Ronald Cohen's April 7, 2004 affidavit supporting the retention of Cohen Estis as

counsel to the Debtors, Mr. Cohen describes at length the procedures used by the Cohen Estis

firm to determine "its relationships, if any, to parties that may have connections to a client

debtor." (ECF Docket No. 10, ¶3)  According to Mr. Cohen, a list of interested parties, including

equity holders, officers and directors, and significant creditors was compiled, and this list was

compared with the names in its "master database of current and former clients," which includes

the name of each client, the "name of the parties that are or were adverse to such client" and the

names of Cohen Estis personnel who are or were primarily responsible for the matters. (*Id.* at

¶3(b))  Mr. Cohen reported:

> As a result of the foregoing procedures, I have ascertained that, upon information
> and belief, [Cohen Estis] has no connections with the Debtors and the Potential
> Parties-In-Interest except as follows:
> * * *
> c) [Cohen Estis] has not represented any Potential Parties-In-Interest.

In other words, Mr. Cohen would have the Court believe that Cohen Estis's conflict search did

not reveal that the firm currently represented Donald Boehm or the Frederic Warmers Estate.  It

is impossible that Ronald Cohen was unaware of Boehm's connection with these cases,

particularly when Boehm signed the Haddon and Sarah petitions and was listed as the largest

- 37 -

known unsecured creditor. Cohen Estis's time records reveal that Ronald Cohen was in regular contact with Boehm.[13] Moreover, Cohen Estis had been retained to defend Boehm against foreclosure of his personal residence, which had been guaranteed as collateral to Hudson United Bank in connection with loans to the Debtors. Cohen Estis also represented Boehm personally, along with Boehm's corporation, Connelly Industries, in state court litigation, and also handled a real estate transaction on behalf of the Tessie Warmers Trust, of which Boehm was the Trustee. The real estate transaction that Cohen Estis handled on behalf of the Tessie Warmers Trust also produced revenue for Connelly Industries, according to Cohen Estis's own Engagement Letter, and, Cohen Estis contends, generated the Retainer.

Ronald Cohen and Cohen Estis also knew that the Frederic Warmers Estate was a creditor of the Debtors, and that Donald Boehm had been the Trustee of the Frederic Warmers Estate. Ronald Cohen and Cohen Estis must have also known that both before and after the bankruptcy filing Cohen Estis was engaged in preparing an accounting on behalf of the Frederic Warmers Estate, an entity adverse to both Boehm and the Debtors. Thus, Cohen Estis represented both (1) the Debtors, (2) Donald Boehm, who was the Debtors' principal and major

---

[13]    Ronald Cohen's time entries include the following:

March 30, 2004, 1.80 hours (attended conference with Donald Boehm); March 31, 2004, 4.50 hours (attended conference with Donald Boehm); April 3, 2004, 3.50 hours ("Conference with AW, DB and NC regarding administrative work to be undertaken by the Cohen Estis firm and outline of roles of ronald [Sic] Jay cohen [sic] and Andrew Wulfman for protection of debtor; there would always be at least tow [sic] attorneys familiar with the matter"); April 25, 2004, 1 hour (discussion with Donald Boehm); May 24, 2004, .10 hour (continued discussion with Donald Boehm); November 5, 2004, 2.25 hours (conference with Donald Boehm "as to multifaceted overview of status of UPS – offer of Goldstein; Consideration of offer of Joseph Freund and desire to stay with Valdman if he can produce because that is my word"); November 10, 2004, .50 hour (telephone call to Donald Boehm in connection with meeting set for Thursday November 11, 2004 to review status of matters); November 14, 2004, 2.40 hours (conference at Cohen Estis with Donald Boehm and Aric Valdman); November 16, 2004, 1.50 hours (detailed communication with Donald Boehm and Aric Valdman); November 22, 2004, 5.50 hours (conference with Simon Schwartz, Bernard Mittleman and Donald Boehm); November 26, 2004, .25 hour (telephone call from Donald Boehm); November 28, 2004, 4.20 hours (Sunday conference with Donald Boehm, Bernard Mittleman and Simon Schwartz).

- 38 -

creditor, and (3) The Frederic Warmers Estate, which was a major creditor. The reality of the

situation is that entities such as the Debtors, the Frederic Warmers Estate, the Tessie Warmers

Trust, and Connelly Industries can only act through their representatives; in each case, the

representative that Cohen Estis dealt with was Donald Boehm.

Ronald Cohen's statement in his April 7, 2004 affidavit – that "neither I, [Cohen Estis],

nor any member or counsel, or associate of the Firm represent any party in interest other than the

Debtors in these chapter 11 cases" – was misleading because the retention application did not go

on to disclose Cohen Estis's representation of parties in interest outside of the chapter 11 cases.

The only affirmative disclosure that Cohen Estis points to is contained in the following

paragraphs from Ronald Cohen's April 7, 2004 affidavit:

> 4. As a result of the foregoing procedures, I have ascertained that, upon
> information and belief, [Cohen Estis] has no connections with the Debtors and the
> Potential Parties-In-Interest except as follows:
>
>> (a) Because of its broad-based general practice, [Cohen Estis] has
>> appeared in the past and may appear in the future in cases unrelated to
>> this chapter 11 case where one or more of the Potential Parties-In-
>> Interest may be involved
>>
>> * * *
>
> 5. I believe that none of the representations or relationships recited above
> would give rise to a finding that [Cohen Estis] represents or holds an interest
> adverse to the Debtors with respect to the services for which [Cohen Estis] would
> be retained.

This type of carefully crafted, say-nothing disclosure was aptly described by another court as

"coy" and insufficient because it requires the Court to "ferret out pertinent information from

other sources". *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991) (regarding disclosure of

fee arrangements). Even the disclosure relied upon by Cohen Estis is misleading because it does

not reveal that Cohen Estis actually represented other parties in interest, and it incorrectly

concludes that such representations or relationships would not give rise to a finding that Cohen

Estis represented or held an interest adverse to the Debtors.

**II.    Lack of Disinterestedness**

Bankruptcy courts have the discretion to deny allowance of compensation to a professional employed under Bankruptcy Code Section 327 "if, at any time during such professional person's employment under section 327 . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." 11 U.S.C. § 328(c).

Ronald Cohen stated in his April 7, 2004 affidavit that Cohen Estis, its members, counsel and associates: "do not have an interst [sic] materially adverse to the interest of the estate or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interst [sic] in, the debtor . . . ." That statement was blatantly false, or at best misleading, because Cohen Estis also represented Donald Boehm, whose interests are directly and materially in conflict with the interests of the estate, as well as to the other creditors. This Court stated nearly two years ago that: "[t]he obvious goal of the reorganization is not an effort to repay the few non-insider creditors but an effort to salvage the investments of Mr. Boehm and other insiders." *In re Balco Equities Ltd., Inc., supra,* 312 B.R. at 753. Thus, Cohen Estis's justification for failing to disclose its relationship with Boehm because Cohen Estis "only tried to generate a dividend for unsecured creditors" is absurd. Cohen Estis is really arguing that its failure to disclosure its relationship with Donald Boehm should be excused because Cohen Estis "only tried to generate a dividend for [primarily, Donald Boehm]". The Frederic Warmers Estate, which Cohen Estis represented both pre- and post-petition, is also materially adverse to the Debtors. The Frederic Warmers Estate continues to assert that Donald Boehm, while he was the executor, wrongfully permitted the transfer of the New Windsor Property to Balco. Cohen Estis prepared an accounting on behalf of the Warmers Estate and was reporting financial

information for the period when Boehm was executor at the same time that Cohen Estis represented these Debtors, which are Boehm's corporations. The conflict of interest is obvious.

Even taking Cohen Estis's desire to help unsecured creditors at face value, and even if the Court credited Cohen Estis with "creating a buzz" that lead to the Chapter 7 sale of the New Windsor Property, the Court would still be compelled to deny all fees. No matter how laudable the purported intentions, the failure to reveal such obvious and extensive connections and conflicts of interest could never be excused based upon a desire to help unsecured creditors. On both the principle and the facts, the Court also rejects Cohen Estis's argument, essentially that the ends justify the means, and that Cohen Estis should receive some compensation for its role in the eventual sale of the New Windsor Property. First, the Court believes that the requirements in the Bankruptcy Code and Rules pertaining to disclosure and disinterestedness do not provide for exceptions, regardless of whether the professional's services benefit the estate. *See, e.g., In re eToys, Inc.*, 331 B.R. 176, 193 (Bankr. D. Del. 2005) ("Harm to the estate is not necessary to a decision to order disgorgement of fees where there is a conflict of interest.") (quoting *In re Leslie Fay Cos., supra*, 175 B.R. at 531). Second, as noted above, litigation over the proceeds of the New Windsor Property is ongoing, and it is not yet clear that the estate will receive any benefit from the sale. As this Court has tried to impress throughout this decision, the Chapter 11 reorganization was disastrous and imploded into a black hole of Chapter 7 litigation. While there is still a potential for a distribution to unsecured creditors, it is also possible that the estate could wind up administratively insolvent. There is very little that can be said about the Chapter 11 case or subsequent Chapter 7 case in mitigation of Cohen Estis's failure to disclose its conflicts of interest.

This brings the Court to the final argument offered by Cohen Estis for why its fees should not be denied in full. Cohen Estis lays the blame for virtually everything that went wrong in this case at the feet of its former associate, Andrew Wulfman. Part 1200.5 [DR 1-104] of New York's Disciplinary Rules of the Code of Professional Responsibility provides:

**Responsibilities of a partner or supervisory lawyer and subordinate lawyers.**

A. A law firm shall make reasonable efforts to ensure that all lawyers in the firm conform to the disciplinary rules.

B. **A lawyer with management responsibility in the law firm or direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the disciplinary rules.**

C. A law firm shall adequately supervise, as appropriate, the work of partners, associates and nonlawyers who work at the firm. The degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter, and the likelihood that ethical problems might arise in the course of working on the matter.

D. **A lawyer shall be responsible for a violation of the disciplinary rules by another lawyer or for conduct of a nonlawyer employed or retained by or associated with the lawyer that would be a violation of the Disciplinary Rules if engaged in by a lawyer if:**

　1. The lawyer orders, or directs the specific conduct, or, with knowledge of the specific conduct, ratifies it; or

　2. **The lawyer is a partner in the law firm** in which the other lawyer practices or the nonlawyer is employed, or has supervisory authority over the other lawyer or the nonlawyer, **and knows of such conduct, or in the exercise of reasonable management or supervisory authority should have known** of the conduct so that reasonable remedial action could be or could have been taken at a time when its consequences could be or could have been avoided or mitigated.

E. A lawyer shall comply with these Disciplinary Rules notwithstanding that the lawyer acted at the direction of another person.

F. A subordinate lawyer does not violate these Disciplinary Rules if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.

"DR 1-104(D)(2) prevents a lawyer from attempting to lay blame upon a partner, associate or non-lawyer employee for misconduct that occurs in the lawyer's office. This provision

recognizes that a lawyer is under a duty to know how a client's file is being handled and cannot simply claim ignorance of another's misconduct." *Heritage East-West v. Chung & Choi*, 6 Misc.3d 523, 531-532, 785 N.Y.S.2d 317, 324 (N.Y. City Civ. Ct. 2004) (quoting Connors, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 29, Professional Responsibility, DR 1-104). In *Chung & Choi*, a landlord and its attorney were sanctioned for filing six "patently false" affidavits of investigation of non-military status in order to obtain default judgments and warrants of eviction. Although the affidavits were prepared and sworn to by an employee of the landlord's attorney, the attorney was sanctioned for submitting the false affidavits because "the responsibility for the accuracy and truthfulness of the statements contained therein ultimately falls upon the Petitioner and the Petitioner's attorney who filed them with the court," and the attorney "knew or should have known that they were false but submitted them to the Court with either actual or imputed knowledge of their falsity in order to procure default judgments and warrants of eviction." 785 N.Y.S.2d at 324-325. In *In re Levin*, 1998 WL 732878 (Bankr. E.D. Pa. Oct. 15, 1998), an attorney's fees were partially disgorged when it was revealed that he had not received payment as reported in the 2016(b) statement filed with the bankruptcy court. The court noted that the attorney "sought to place blame on an associate in his office, contending that what occurred here was not representative of his practice." 1998 WL 732878 at *4, n. 2. Nevertheless, the court in *Levin* held, as this Court does, that "the fact that it was done by him or someone working for him is irrelevant to the consequence of the conduct." *Id.*

While Mr. Cohen may have relied upon Mr. Wulfman to "manage the principal procedural aspects of the bankruptcy case," the ultimate responsibility for failure to disclose connections with parties in interest in this case rests with the partners in the Cohen Estis firm. Although Mr. Cohen has stated that Mr. Wulfman was the "drafter, editor and proofreader of all

- 43 -

Affidavits I submitted to the Court in 2004," Mr. Cohen does not deny that he signed the

affidavits, and he does not claim that he was unaware of their contents. Mr. Cohen was required,

in his reasonable exercise of supervisory authority – not to mention his own duty as an officer of

the Court – to inform himself as to the contents of any affidavit that he signed. As illustrated in

the *Chung & Choi* case, *supra*, an attorney with supervisory authority may be held responsible

even for those submissions that he or she did not sign; the same principle applies even more

forcefully where, as here, the supervising attorney attempts to blame a subordinate for false

statements contained in documents signed by that same supervising attorney.

     Moreover, even if Mr. Cohen was not fully aware of the disclosure requirements in

Bankruptcy Code Section 327(a) and Bankruptcy Rule 2014(a), the conflicts of interest were not

unique to bankruptcy law. Even outside of the bankruptcy setting, the simultaneous

representation of Boehm, Balco, Haddon, Sarah, the Warmers Estate, the Tessie Warmers Trust,

and Connelly Industries would be impermissible under the New York Disciplinary Rules. DR 5-

105 states in relevant part:

    **DR 5-105 Conflict of Interest; Simultaneous Representation.**

    A.  A lawyer shall decline proffered employment if the exercise of independent
        professional judgment in behalf of a client will be or is likely to be affected by
        the acceptance of the proffered employment, or if it would be likely to involve
        the lawyer in representing differing interests....

    B.  A lawyer shall not continue multiple employment if the exercise of
        independent professional judgment in behalf of a client will be or is likely to
        be adversely affected by the lawyer's representation of another client, or if it
        would be likely to involve the lawyer in representing differing interests....

    C.  In the situations covered by DR 5-105(A) and (B), a lawyer may represent
        multiple clients if a disinterested lawyer would believe that the lawyer can
        competently represent the interest of each and if each consents to the
        representation and the advantages and risks involved.

    D.  While lawyers are associated in a law firm, none of them shall knowingly
        accept or continue employment when any one of them practicing alone would
        be prohibited from doing so under DR 5-101 ["Conflicts of Interest –

Lawyer's Own Interests"], DR 5-105(A) or (B), DR 5-108 (A) or (B)
["Conflicts of Interest – Former Client"] or DR 9-101(B) ["Avoiding Even the
Appearance of Impropriety"] except as otherwise provided therein.

E.  A law firm shall keep records of prior engagements, which records shall be
made at or near the time of such engagements and shall have a policy
implementing a system by which proposed engagements are checked against
current and previous engagements, so as to render effective assistance to
lawyers within the firm in complying with DR 5-105(D).  Failure to keep
records or to have a policy which complies with this subdivision, whether or
not a violation of DR 5-105(D) occurs, shall be a violation by the firm.  In
cases in which a violation of this subdivision by the firm is a substantial factor
in causing a violation of DR 5-105(D) by a lawyer, the firm, as well as the
individual lawyer, shall also be responsible for the violation of DR 5-105(D).

Mr. Cohen's position is that he agreed to take the case, then assigned the details to his

associate, Mr. Wulfman, who failed to make the proper disclosures to the Court and to the other

parties in interest.  Mr. Cohen should have known, and was in the best position to know, that his

firm had multiple conflicts of interest that should have barred Cohen Estis from ever representing

the Debtors.  Moreover, under DR 5-105(D), the Cohen Estis firm as a whole is at fault for

maintaining a flawed "master database of current and former clients" that did not reveal that

Donald Boehm and the Warmers Estate were current clients.

This Court is sympathetic to Mr. Cohen's medical condition, as the Court is sympathetic

and accommodating to any person with a chronic illness. The existence of Mr. Cohen's condition

does not excuse the Cohen Estis firm's ethical obligations or the duty to disclose conflicts of

interest to the Court and United States Trustee as required by the Bankruptcy Code and Rules.

**III.   Disgorgement**

The Court also directed Cohen Estis to disgorge the Retainer to the Chapter 7 Trustee, to

be held in escrow pending further order of the Court.  The Court has ordered the disgorgement

because, according to its current Rule 2016(b) Statement, Cohen Estis received the Retainer, and

Cohen Estis's fees have been denied in the case.  Thus, the Retainer sworn by Cohen Estis as

paid to the firm for work to be performed in the Chapter 11 cases must be returned to the entity that furnished Cohen Estis with the Retainer.[14]

Deborah Weisman-Estis has objected that "there still must be a finding that a payment was made by the Debtor so that the Court would have the jurisdiction to order disgorgement of that payment to the Chapter 7 Trustee," and that the Court is unfairly relying "as the sole evidentiary proof ... a certification prepared by Mr. Wulfman, and signed by Mr. Cohen when he was visually impaired". (ECF Docket No. 330, ¶11)  Ms. Weisman-Estis is correct that an evidentiary hearing is necessary.  The Court's ruling preserves the right of all parties, including Cohen Estis, to present evidence as to the source of the Retainer.  However, until Cohen Estis is able to prove at trial its contention that Cohen Estis will effectively be disgorging the Retainer to itself (ECF Docket No. 325, ¶15), Cohen Estis has no greater right to the Retainer than the Chapter 7 Trustee (which claims the Retainer as property of the estate) or the Tessie Warmers

---

[14]   This is required, for example, under Section 329 of the Bankruptcy Code, which provides:

§ 329. Debtor's transactions with attorneys

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to --

(1) the estate, if the property transferred –

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

There is no logical reason why payment should not also be returned to the entity that made it in a case where compensation is denied for failure to make disclosures required by Bankruptcy Code Section 327 and Bankruptcy Rule 2014, and for lack of disinterestedness pursuant to Bankruptcy Code Section 328(c).